McCALEB, Justice.
 

 Plaintiff, the surviving husband of Mrs. Martha Glisson who was killed when the automobile she was driving collided with a passenger train, brought this suit, individually and on behalf of decedent’s two minor children, to recover damages for her alleged wrongful death.
 

 The accident occurred at a rural grade crossing over the railroad track of defendant located about two miles north of Kinder in Allen Parish. The railroad right of way is 100 feet wide accommodating a single straight track, which runs North and South, laid approximately in the middle of the right of way.
 

 The principal defendant in the case is Missouri Pacific Railroad Company, owner of the passenger train. However, plaintiff also joined J. P. Kohler, Jr., operator of the train and C. M. Todd, the fireman, as joint tortfeasors.
 
 [1]
 

 Plaintiff alleges that on December 31, 1961, at approximately 12:35 P.M., Mrs. Glisson, accompanied by two guest passengers, was driving a 1957 Rambler sedan in a westerly direction on a parish gravel road, known as Johnson Road, from her home across the railroad tracks to its inter
 
 *473
 
 section with U. S. Highway 165; that these individuals were part of a group of Pentecostal Church members who were on their way to Oakdale, Louisiana to hold a radio broadcast church service (Mrs. Glisson being a minister of the church) ; that at this time defendant was operating its passenger train in a southerly direction across the intersection of the parish road, locally known as Cottongin Crossing; that the Glisson car was the third or last car in the caravan of church workers on their way to the radio church service, the other two cars having already safely traversed the crossing and that when Mrs.' Glisson drove upon the track, after taking the precaution of stopping, looking and listening for any railroad traffic that might be in the vicinity, her car was violently struck by defendant’s passenger train, causing the automobile to be torn asunder and resulting in the death of all its occupants. It is asserted that Cottongin Crossing was an unusually hazardous and unsafe crossing due to the neglect of defendant in not removing the weeds, brush and trees from its right of way, which vegetation obstructed the view of motorists using the railroad crossing, thus constituting a veritable trap and that the maintenance of it, coupled with the imprudent manner in which the train was being operated (at excessive speed and without giving adequate warning signals of its approach) was the proximate cause of the accident and the resulting death of Mrs. Glisson.
 

 Defendants deny fault in any respect and plead that the accident was solely attributable to the negligence of Mrs. Glisson in traversing the railroad crossing with which she was familiar, without stopping, looking or listening for approaching trains and carelessly driving her automobile onto the track, notwithstanding that the train was plainly visible and the train crew had given audible warnings by whistle and bell. In the alternative, defendant pleads the contributory negligence of Mrs. Glisson in the acts enumerated above.
 

 On the issues thus joined, a trial was had before a jury which returned a verdict in favor of the plaintiff. On appeal, however, the Court of Appeal, Third Circuit, reversed the judgment holding it was unnecessary to determine whether the railroad’s employees were at fault because Mrs. Glisson was undoubtedly guilty of contributory negligence barring plaintiff’s recovery. See Glisson v. Missouri Pacific Railroad Company, La. App., 158 So.2d 875.
 

 The majority of the Court of Appeal (two judges dissented) impressively stated:
 

 “Most of the evidence concerns itself with the question of whether the view of a westbound motorist to the north was obstructed by weeds and
 
 *475
 
 bushes growing within the railroad right of way. Plaintiff introduced the testimony of several witnesses who said this was a dangerous crossing and gave estimates, varying from 50 to 400 feet, of the distance which Mrs. Glisson, from a position at the stop sign, could see the approaching train. We do not think it necessary to discuss these estimates in detail because certain pictures, taken shortly after the accident, and the testimony of witnesses who actually measured the distance, show that the railroad right of way was clear of all view obstructing weeds and bushes for a distance of 380 feet north of the crossing. From a position at the stop sign, or at any point between the stop sign and the tracks, Mrs. Glisson had an unobstructed view 380 feet to the north. The railroad had kept its right of way cleared for this distance.
 

 * ***** “Under these facts we think it is clear that the dangerous trap doctrine has no application here. Mrs. Glisson did not have to place herself in a position of peril, dangerously close to the tracks, in order to see the approaching train. At. any point between the stop sign (which was 48 feet from the tracks) and the crossing, Mrs. Glisson had an obstructed (sic-unobstructed) view of the approaching train for a distance of 380 feet, and a partially obstructed view for a distance of at least 600 feet. ******
 

 “We think it unnecessary to decide whether the railroad was guilty of negligence, in failing to clear its right of way for a greater distance than 380 feet from the crossing, or in failing to give adequate warning by blowing the whistle or ringing the bell fór a longer period of time, because, in any event, the evidence is clear that Mrs. Glisson was guilty of contributory negligence barring plaintiff’s recovery.
 

 “The general rule of law is that a motorist approaching a railroad crossing must use his senses of sight and hearing for possible oncoming trains, before traversing the crossing. Tucker v. Illinois Central Railroad Company, 141 La. 1096, 76 So. 212; Rachal v. Texas & Pacific Railway Company, La.App., 61 So.2d 525; Matthews v. New Orleans Terminal Company, La.App., 45 So.2d 547. A motorist negotiating a railroad crossing is burdened with the responsibility of seeing and hearing that which he could have seen and heard, and he is presumed in law to have seen and heard what he could have seen and heard. Jackson v. Cook, 189 La. 860, 181 So. 195. If the motorist’s view of the right of way is obstructed, he must exercise a higher degree of caution. See Renz v. Texas
 
 *477
 
 & Pacific Railway Company, [La.App.] 138 So.2d 114, and the authorities cited therein. .
 

 * * =i= * * * “Applying these rules of law to the facts of the instant case, it is inescapable that if Mrs. Glisson had stopped at the stop sign, 48 feet from the crossing, she could and should have seen the train approaching. Even if she did not stop, but only slowed down and looked and listened for the approaching train, while maintaining her vehicle under such control as to be able to stop immediately, she could and should have seen the train approaching in time to stop. She lived in the immediate vicinity and was thoroughly familiar with this crossing and the view which she had of approaching trains. She certainly should have used greater caution.
 

 “Of course, the uncontradicted testimony of the train crew is that Mrs. Glisson did not stop, but proceeded onto the crossing at a speed of about 20 miles per hour. If she did this she is clearly contributorily negligent. However, even if the jury did not believe this testimony of the train crew, the physical facts themselves show she was negligent. Had the decedent come to a stop upon entering the right of way, or had she even slowed down and looked and listened for an approaching train, as she was required to do, the accident would not have happened.”
 

 Upon finality of the judgment of the Court of Appeal, plaintiff applied for a writ of review. He complained that the court erred in rejecting the “dangerous trap doctrine ”
 
 [2]
 
 and that the court incorrectly based its conclusion solely on. a series of photographs taken by agents for the railroad several days after the accident when the conditions at the crossing on the date of the accident had been changed by the cutting of bushes and weeds and freezing weather and rain. It was also alleged in the application that certain photographs taken by defendant’s agents on the date of the accident had not been produced by defendant and that the Court of Appeal ignored this fact and failed to give plaintiff the benefit of the presumption that, had the pictures been produced they would have been detri
 
 *479
 
 mental to defendant’s case. In view of these charges, we granted certiorari and the case has been argued and submitted for our decision.
 

 After a careful review of the record, we have no hesitancy in concluding that the matter was properly decided by the Court of Appeal and also that the errors specified by plaintiff in his application and argument here are without substantial foundation.
 

 In the first place, it takes no more than a perusal of the photographs of the crossing, the railroad right of way and the approach thereto from the intersecting gravel road to exhibit that it is not an obstructed crossing or a dangerous trap. Nor is there any believable evidence in the record to show that the physical conditions of the crossing and vicinity were altered either by act of man or weather at the time these photographs were taken. Even the photographs submitted by plaintiff (some of which were taken on the day of the accident) are destructive of his theory that the crossing is a trap.
 
 [3]
 
 Indeed, while plaintiff’s witnesses insisted on direct examination that, because of the growth of bushes and weeds, a clear view towards the north could not be obtained until a person had reached a point between 5 and 20 feet from the track, some of them, especially State Troopers L. J. Bertrand and Glynn C. Jarnigan, conceded under cross-examination that the photographs taken by defendant, particularly a panoramic view of the crossing taken on January 2, 1962 (two days after the accident) with the camera located 48 feet east of the track, which shows the right of way cleared back a distance of 350 feet, represented the true condition of the crossing at the time of the accident.
 

 The only eye witnesses to the accident were the train crew of the railroad company. They testified, in substance, that the train was travelling with the headlight burning (the purpose of which is to attract attention of people around crossings) at a speed of 64 miles per hour (not excessive at rural crossings) and that when it was 1800 to 2000 feet to the north of the crossing, proper signals were given — blast of whistle and ringing of bell; that about 200 feet from the crossing the engineer, who was acting as fireman at the time, and the regular fireman saw the Glisson car come over the stop sign at a speed of
 
 *481
 
 approximately 20 miles per hour and heedlessly continue onto the track; that as soon as they saw the car, which did not slacken its speed, they immediately advised the operator (Mr. Kohler, road foreman of engines on the DeQuincy Division) and the emergency brake was applied but that nothing could have been done at that time to avert the tragic accident.
 

 The testimony of the train crew and another representative of the railroad that the bell was rung and whistle blown in compliance with law for over 1800 feet in advance of the crossing is corroborated by another person, James McGee, who was a passenger in the first automobile of the caravan of church workers that had passed over the crossing. This 16-year-old boy stated that the car, in which he was riding, had proceeded some 1000 feet north of the crossing on Highway 165 (which runs parallel to the track in this vicinity) at the time the train passed the car on its way to the crossing and that he heard the whistle blowing.
 

 In rebuttal of the positive evidence of the train crew, plaintiff’s witnesses state negatively that they did not hear the whistle blow. One or two of them say they did not hear the crash even though they were in the close vicinity at the time. This testimony is probably explained by the fact that it was a cold day and the automobiles in the caravan were driven with the windows closed. At any rate, these same witnesses — occupying the first two automobiles in the caravan — noticed the train with its headlight burning some distance to the north when they traversed the crossing. None of plaintiff’s witnesses were asked the question whether the train bell was ringing and, therefore, there is no denial of the testimony of defendant’s employees that the bell was being rung.
 

 For our part, we see no reason to doubt the veracity of the statements given by the train’s crew for, albeit they are interested witnesses, their testimony is fully supported, we believe, by the physical facts of the case.
 

 In any event, if it be that the operators of defendant’s train were guilty of any negligence, then we think it clear, as the Court of Appeal found, that Mrs. Glisson was guilty of contributory negligence barring plaintiff’s recovery.
 

 Finally, we find no merit in plaintiff’s complaint that defendant refrained from offering some photographs taken of the crossing on the day of the accident. W. L. Gabbert took pictures for the defendant on December 31, 1961, January 2, 1962 and December 29, 1962. Only one picture taken on December 31, 1961 was introduced in evidence. This shows the railroad track from a position south of the crossing and the demolished automobile which was severed by the blow it received. On the witness stand, Mr. Gabbert was asked if he
 
 *483
 
 recalled taking a picture to the north of the crossing. He answered that he did and that he was sure it was in the set of photographs offered in evidence. Evidently, counsel for plaintiff thought that the witness meant a picture taken on December 31st. Mr. Gabbert did take pictures from the north of the crossing but those pictures were taken on January 2, 1962 and not on the date of the accident.
 

 For the reasons assigned, the judgment of the Court of Appeal is affirmed.
 

 [1]
 

 . For convenience we will refer herein to the railroad as the sole defendant.-
 

 [2]
 

 . The Court of Appeal, after citing authorities, correctly points out that the eases hold that, “ * * * if a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warnings or providing signaling devices etc. The theory of this doctrine is that the railroad may not rely upon the duty of the motorist to stop and look, if the physical circumstances are such that stopping and looking will do the motorist no good.”
 

 [3]
 

 . A photograph, which was taken by Trooper Bertrand on the day of the accident, of the view to the north from a position below the shoulder of the gravel road on the south side thereof, across from the railroad stop sign (48 feet from the track and facing vehicular traffic proceeding West), shows plainly that all weeds and shrubbery on the railroad right of way were not more than 1 or 2 feet higher than the gravel road and makes it evident that anyone occupying an automobile stopped at the sign obtained a clear vision for quite a space (a distance shown by accurate measurement taken by the railroad’s agents and found by the Oourt of Appeal to be 38ft feet north of the stop sign).