REGAN, Judge.
Plaintiff, Paul Mediamolle, Sr., instituted this suit on behalf of his minor son, Paul Mediamolle, Jr.,[1] endeavoring to recover the sum of $161,637.22 from the defendants, the Southern Pacific Company,[2] Louisiana Power and Light Company, and W. A. Arceneaux, Southern Pacific’s engineer, which amount represented damages for personal injuries and medical expenses incurred by Mediamolle, Jr., as the result of a collision between his automobile and a tank car forming part of a train which was operated by Arceneaux.
The railroad answered on behalf of itself and Arceneaux, denying the plaintiff’s accusations of negligence and insisting that the sole cause of the accident was the negligence of Mediamolle in the operation of his vehicle. In the alternative, the railroad specially pleaded Mediamolle’s contributory negligence.
Louisiana Power and Light Company also answered and therein denied the existence of any negligence on its part.
The case was tried before a jury, which returned a verdict awarding Mediamolle, Jr., $60,000.00 and awarding his father $7,220.28 for special damages incurred by him. This verdict was returned against Southern Pacific, but not against the Louisiana Power and Light Company. Judgment was rendered in accordance with *237 the jury’s verdict, and Southern Pacific thereafter prosecuted this appeal.
Plaintiff voluntarily dismissed his suit against Arceneaux before the case was submitted to the jury. Moreover, no appeal has been taken by either plaintiff or Southern Pacific from that part of the judgment exonerating the Louisiana Power and Light Company from liability. Therefore, it is conceded by all of the litigants that the question of liability vel non of Arceneaux and Louisiana Power and Light is not a subject for consideration by this court.[3]
The record reveals that on February 6, 1961, at 1:15 a. m., plaintiff’s minor son, hereinafter referred to as “plaintiff”, drove his automobile into the side of one of the defendant’s railroad tank cars, which obstructed the roadway at a point where the defendant’s track crosses Monroe Street in the City of Gretna. The situs of the accident reveals that Monroe Street is a paved two lane artery possessing shell shoulders on either side, and it accommodates traffic moving both north and south. The single track traverses Monroe Street at an angle of approximately 45 to 55 degrees at a height of 4.9 feet above the level of the main roadbed. The slope from street level to the level of the track commences at a point 250 feet south of the track and reaches a crest, or plateau, 50 feet from the track itself. The remaining 50 feet between the crest of the slope and the track forms a level plateau 4.9 feet above street level.
The evidence is somewhat conflicting as to the driving conditions which prevailed on the night of the accident. Some of the testimony indicates that a slight mist was falling, while other evidence reflects that the weather was clear. It is undisputed, however, that the night was extremely dark.
Southern Pacific, sometime prior to the accident, had arranged for Louisiana Power and Light Company to erect two large floodlights, one positioned on either side of the track, so as to illuminate the crossing, but neither of these lamps were burning.[4] Moreover, the nearest municipal light standard was about 90 feet to the south of the track on the left side of the street. On the right side of the street a traffic sign had been erected which limited vehicular speed to 25 miles per hour, as well as a highway sign which warned approaching motorists of the existence of the track some 200 feet to the north thereof, but neither of these signs were illuminated when the collision occurred.
The train, of which the tank car formed a part, was moving in a northeasterly direction and was engaged in a switching operation. The distance between the switch and the crossing was insufficient to accommodate the engine and the four cars being drawn by it, so that the street was completely obstructed by the train. The defendant’s switch engine was engaged in a back-up motion with its cab at its forward end. The engine’s rear headlight was on, illuminating the track in the direction opposite from the crossing and from the tank cars. Several other small lights were burning on the side of the engine, but these were obscured from the view of passing motorists by a billboard which was located near the crossing.
The occupants of the cab were the engineer, W. A. Arceneaux, and the fireman, Charles I. Lopez, both of whom were seated, to the left and right respectively, facing in the direction of the train’s movement. When the engine reached Monroe Street, it was stopped so as to permit the crew to look both ways for approaching traffic. When they had ascertained that the roadway was clear, the whistle and bell were sounded and the train was moved across the roadway. Immediately after the engine crossed the street, the train was brought to *238 a complete stop in order to permit a member of its crew to “throw” the switch. Thus the tank car directly behind the engine was stopped and was obstructing the street when the plaintiff drove his vehicle into the side thereof.
When the accident occurred, Paul Mediamolle, Jr., was accompanied by three friends, all of whom were teenagers. They had just departed from a drive-in restaurant located at the corner of Monroe and Kepler Streets, two blocks to the south of the defendant’s track. Plaintiff turned into Monroe Street and drove north toward the track. The radio was playing, and the four boys were engaged in a rather animated conversation. It is obvious from the record that neither plaintiff nor his passengers paid any attention to the railroad crossing, although it is well established by the testimony that the plaintiff was familiar with the area and knew the location of the track.
The exact speed at which the automobile was driven is, as usual, disputed. The lowest estimate, made by Mediamolle, Jr., was, in his words, “somewhat less than forty-five miles per hour,” although his companions estimate the speed from 45 to 55 miles per hour, which of course, is well above the posted 25 miles per hour speed limit. There was no visual obstruction between the plaintiff and the tank car; the only impediment to the plaintiff’s vision was the intense darkness of the night.
Plaintiff testified that despite the maintenance of a proper lookout, his headlights did not pick up the tank car until he was a short distance removed therefrom. He immediately applied the brakes, but the automobile nevertheless struck the train with sufficient force so as to demolish the front end of the vehicle and pin the plaintiff between the steering wheel and the front seat thereof. Measurements made at the scene by investigating officers revealed that the plaintiff’s car skidded 56 feet prior to the collision.
To reiterate, the jury returned a verdict in favor of the plaintiff and against Southern Pacific in the total amount of $67,220.28.
In response to special interrogatories propounded to it, the jury found (1) that the railroad was negligent and that its negligence was the proximate cause of the accident; (2) that Louisiana Power and Light Company was negligent, but that its negligence was not the proximate cause of the accident; and (3) that the plaintiff was guilty of contributory negligence, but that his negligence was not the proximate cause of the accident.
We have observed heretofore that when a suit is predicated on an allegation of negligence and the defense thereto is a denial of negligence and an alternative plea of contributory negligence, it is often expedient to initially consider the plea of contributory negligence, for if the facts disclose the existence of contributory negligence without which the accident would not have occurred, it is then unnecessary to determine whether there was primary negligence in the defendant.
In considering such a plea, it is well established that the existence vel non of contributory negligence is a question of fact, and that the determination of the arbiter of the facts, be it judge or jury, is to be afforded great weight by an appellate court. Therefore, the fundamental question posed for our consideration is whether the verdict of the jury was so erroneous and unsupported by the evidence as to warrant a reversal by us.
Assuming arguendo that the railroad was negligent in not having flares or other safety devices placed in a position to warn approaching motorists of the train’s presence,[5] the conclusion is inevitable that *239 the plaintiff did not exercise that degree of care and caution in the operation of his vehicle commensurate with the conditions which he knew existed on the night of the accident. It is conceded that the posted speed limit at the crossing was 25 miles per hour. It is also established as a fact that the plaintiff, and at least one of his passengers, was fully aware of the existence of the crossing, and that the roadway ahead of his vehicle was clothed in intense darkness. It is significant to note at this point that the plaintiff’s own expert witness, a traffic engineer, emphatically testified that (assuming the '‘city” or low beam of the plaintiff’s headlights were being used) the plaintiff should have been able to see the tank car, which obstructed the path of his vehicle, at a distance of 125 feet. This expert then very pertinently related that an individual traveling at a speed of 30 miles per hour — five miles more than the existing speed limit — would have been able to stop within 86.8 feet. If the headlights were on high beam, the expert then emphasized that the plaintiff should have seen the tank car at a distance of 300 feet and that an automobile which was not exceeding the lawful rate of speed could be stopped well within the lesser of these distances. Plaintiff did not know which beam was being used when the accident occurred. In any event, the conclusion is inevitable that if the plaintiff had been driving at or even near the posted speed limit, he would have been able to stop well within the effective range of his headlights.
In considering a factual situation quite similar to this one, Judge Landry, the organ for the court in the case of Gray v. Illinois Central Railroad Company,[6] rationalized the vexatious question posed for our solution as follows:
“ * * * If plaintiff could see “pretty good’ as he testified there is no reason why he did not see the train in time to stop. If visibility was “not so good’ as testified by plaintiff’s brother, plaintiff was under a duty to reduce the speed of his vehicle so as to be able to stop within the range of his vision. Plaintiff was guilty of further negligence in failing to stop in obedience to the provisions of LSA-R.S. 45 :563 and LSA-R.S. 32:243 which both require that a motorist shall stop and look for the approach of trains before proceeding across a railway grade crossing of a public street or highway. In this same connection see Hutchinson v. Texas & N. O. R. Co., La.App., 33 So. 2d 139, Alanza v. Texas & P. Ry. Co., La.App., 32 So.2d 341 and Ashy v. Missouri Pacific R. R. Co., La.App., 186 So. 395.”
Further, in Stein v. Missouri Pacific Railroad Company,[7] the court reasoned thusly:
“ * * * we note particularly that not one of the Louisiana cases cited by plaintiff holds the driver of the approaching vehicle to be free of negligence where he runs into the side of a train which is already on the crossing as he approaches.
# ‡ #
“We have no difficulty in concluding that the plaintiff was guilty of contributory negligence barring his recovery. The law is clear that a motorist approaching a railroad crossing must use his senses of sight and hearing to discover the presence of trains and this duty increases where the motorist is familiar with the crossing. * * * ”
Plaintiff also suggests that because of the total darkness and lack of warning, the railroad car parked as it was directly across the roadway, constituted a trap within the meaning of the dangerous trap doctrine initially enunciated in McFarland v. Illinois Central Railroad Company[8] and other similar cases. This doctrine was later *240 discussed, by the organ for the Louisiana Supreme Court in the case of Glisson v. Missouri Pacific Railroad Company[9] as follows:
“ * * * if a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warnings or providing signaling devices etc. The theory of this doctrine is that the railroad may not rely upon the duty of the motorist to stop and look, if the physical circumstances are such that stopping and looking will do tire motorist no good.”
Plaintiff’s foregoing contention, however, was, in our opinion, satisfactorily answered in' the Stein case, supra, as follows:
“Tire present • case is easily distinguishable from those enunciating the dangerous trap doctrine. In the first place, all of the dangerous trap cases cited involved trains approaching the crossing instead of a train which was already on the crossing as the motorist approached, as in the present case. Furthermore, the dangerous trap doctrine applies where the motorist’s view of the train is obstructed in such a manner that it would do the motorist no good even if he performed his duty to stop, look and listen. In the present case plaintiff’s view of the train on the crossing was not obstructed in any manner. If he had performed his duty to look he could have easily seen the train.”
Finally, plaintiff’s counsel argues that the slope up to the level of the track intercepted the lights of his vehicle and thus prevented him from seeing the tank car which obstructed the roadway. However, an examination of the record, including the testimony of plaintiff’s expert traffic engineer, discloses that the slope, being' a five foot rise over a distance of 200 feet, was entirely too gradual to have intercepted the beams of his headlights.
In view of all that we have said herein-above, we are of the opinion that the jury committed manifest error when it found as a fact that the contributory negligence of the plaintiff was not the proximate cause of the accident.
For the reasons assigned, the judgment appealed from is reversed, and it is now ordered that there be judgment in favor of the Southern Pacific Railroad Company, dismissing plaintiffs’ suit at their cost.
Reversed and rendered.

. During tlie pendency of this suit, Paul Mediamolle, Jr., attained the age of majority and was made a party .plaintiff herein.

. The suit was originally filed against Texas and New Orleans Railroad Company, which subsequently was merged into the Southern Pacific Company; hence, the Southern Pacific Company will be referred to as the defendant throughout this opinion.

. See Emmons v. Agricultural Insurance Company, 245 La. 411, 158 So.2d 594 (1963).

. It was this condition which provoked plaintiff’s inclusion of the Louisiana Power and Light Company as a party defendant in this suit.

. The jurisprudence indicates a contrary holding. See Gray v. Illinois Central Railroad Company, La.App., 132 So.2d 61; Senegal v. Thompson, La.App., 91 So.2d 865.

. La.App., 132 So.2d 61.

. 166 So.2d 381 (1904).

.122 So.2d S45 (1960).

. 165 So.2d 289 (1964).