529 So.2d 515 (1988)
Judy BURK, Jack Burk, Jr., Individually, and On Behalf Of The Minor Martha Carol Burk, Melanie Lynn Burk and Melinda Burk
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, Patricia R. Patten, State Farm Mutual Insurance Company and Granite State Insurance Company.
No. 87 CA 0613.
Court of Appeal of Louisiana, First Circuit.
June 30, 1988.
Writ Denied October 28, 1988.
*516 John Michael Parker and John I. Moore, Taylor, Porter, Brooks & Phillips, Baton Rouge, for plaintiffs-appellants Judy Burk, Jack Burk, Jr., Individually, and on Behalf *517 of the Minor Martha Carol Burk, Melanie Lynn Burk and Melinda Burk.
Boris Navratil and Mr. Douglas K. Williams, Breazeale, Sachse & Wilson, Baton Rouge, for defendant-appellee Illinois Cent. Gulf R. Co.
Before WATKINS, CARTER and FOIL, JJ.
WATKINS, Judge.
This is an appeal from a lawsuit filed by Judy Burk, Jack Burk, Jr., her husband, on behalf of the minor Martha Carol Burk, Melanie Lynn Burk, a major child, and Melinda Burk, a major child, all parties plaintiff, against Illinois Central Gulf Railroad Co. (Illinois Central Gulf), defendant. Originally suit was filed by plaintiffs against Illinois Central Gulf, Patricia Patten, State Farm Mutual Insurance Company, Granite State Insurance Company, The Travelers Indemnity Company of America, and the State of Louisiana, through the Department of Transportation and Development, however, plaintiffs proceeded to trial only against Illinois Central Gulf. The action arises from the collision between a vehicle in which Judy Burk was a guest passenger and an Illinois Central Gulf locomotive pulling a train of railroad cars. Plaintiffs claimed Illinois Central Gulf or its agent or employees were negligent. After a jury trial, the jury returned a verdict finding Illinois Central Gulf to be free from fault, and the trial court dismissed plaintiffs' suit with prejudice. From that judgment, plaintiffs appeal.
The accident took place in daylight on May 15, 1984, when a 1984 Peugeot station wagon driven by Patricia Patten struck an Illinois Central Gulf train at a highway grade-level crossing in a rural area of East Feliciana Parish. Judy Burk, a guest passenger, sustained serious injuries.
The evidence shows the accident occurred on a two-lane black-topped highway running generally east and west. The railroad tracks run north and south, and the plaintiff was travelling east and the train north. The crossing was marked by a circular sign depicting a crossing at some distance from the actual crossing and a cross buck sign immediately before the crossing. The line of vision from the station wagon to the train was partially obscured by a grove of oak trees, weeds, and an abandoned store. The speed of the train as it approached the crossing was approximately 40 m.p.h., the maximum speed permitted for the track in question. The posted speed limit for the highway at the crossing was 55 m.p.h. There is testimony indicating that the driver of the station wagon, Patricia Patten, immediately applied the brakes as she approached the crossing, and the engineer of the locomotive, Charles Welch, testified he threw the train into emergency before the accident occurred, which had the effect of applying the train's air brakes, but both Mrs. Patten and Welch acted too late to avert a collision. The station wagon struck the locomotive on the left side. Ms. Burk sustained severe injuries to her thigh and hip, which required lengthy hospitalization. No one else was injured.
On appeal the plaintiffs presented the following assignments of error:
1. The jury erred in finding that the railroad crossing was not unreasonably dangerous.
2. The jury erred in finding that the defendant, Illinois Central Gulf Railroad, was not at fault in connection with the accident.
3. The trial court erred in prohibiting plaintiffs' experts from testifying as to their opinion regarding the unreasonably dangerous nature of the crossing.
4. The trial court erred in allowing defendant, Illinois Central Gulf Railroad, to show the video tape recreation of the accident to the jury.
5. The trial court erred in prohibiting plaintiffs from introducing evidence of prior accidents at the crossing.
6. The trial court erred in prohibiting plaintiffs from introducing evidence as to the method of operation of trains at the crossing subsequent to the accident.
Plaintiffs' first contention is that under Lincecum v. Missouri Pacific Railroad Co., 452 So.2d 1182 (La.App. 1st Cir.), writ *518 denied, 458 So.2d 476 (La.1984), if there is a dangerous crossing the condition of which results from obstructions to view which prevent a traveller from seeing an approaching train until he is dangerously close to the track, the railroad company is required to exercise caution commensurate with the situation whether it be by reducing the speed of the train, by increasing warnings or otherwise.
The theory presented by the plaintiff is a jurisprudentially created rule known as the "dangerous trap doctrine." The doctrine provides that if a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad will be held liable unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warning devices. See Glisson v. Missouri Pacific Railroad Company, 246 La. 470, 165 So.2d 289 (1964).
The plaintiffs argue that the view of the train was obstructed by trees, high grass, and an abandoned store, thus making the crossing ultra-hazardous. The testimony presented at trial reveals that the corner of the abandoned store nearest the crossing was 58 feet 8 inches from the west rail of the track and 74 feet from the south edge of the road. According to the plaintiff's expert, Sylvanius Walker, a motorist stopping 15 feet from the nearest rail had an unlimited view down the track in the direction from which the train was coming. At 25 feet the motorist could see 540-590 feet; at 50 feet the motorist could see more than 400 feet, at 75 feet the motorist could see 335 feet and at 100 feet the motorist could see 180 feet.[1] Mr. Walker concluded that a motorist who stopped between 15 and 50 feet from the track would be able to observe a train approaching at 40 m.p.h. and be able to make a determination as to whether or not they could safely cross the track, or should wait until the train passed. This testimony was corroborated by defendant's expert, Dr. Olen Dart.
We find the dangerous trap doctrine inapplicable to the facts presented in this case. The evidence clearly establishes that the motorist had a clear view of the tracks at a point which would not place the motorist in a perilous position. See Lagrange v. Missouri Pacific Railroad Company, 503 So.2d 1158 (La.App. 3d Cir.1987). Furthermore, the motorist in this case was familiar with the prevailing conditions at the crossing.[2]Lagrange, supra. The fact that a *519 motorist has to slow a vehicle to obtain a clear view does not render a crossing a "dangerous trap."
Having concluded that the "dangerous trap" doctrine is inapplicable to the facts in this case, we will now address the question of the railroad's negligence.
A case involving a train-vehicle collision should be tried on its own facts and circumstances and only after applying the proper law should the negligence of the parties be determined. Odom v. Hooper, 273 So.2d 510 (La.1973).
"The general rule of law is that a motorist approaching a railroad crossing must use his senses of sight and hearing for possible oncoming trains, before traversing the crossing. A motorist negotiating a railroad crossing is burdened with the responsibility of seeing and hearing that which he could have seen and heard, and he is presumed in law to have seen and heard what he could have seen and heard. If the motorist's view of the right of way is obstructed, he must exercise a higher degree of caution." (Citations omitted.)
Glisson, supra, 165 So.2d at 291. See also Weil v. Southern Pacific Transp. Co., 478 So.2d 697 (La.App. 3d Cir.1985); Buchholz v. Dealers Transport Co., 399 So.2d 1303 (La.App. 4th Cir.1981); Jenkins v. St. Paul Fire & Marine Ins. Co., 393 So.2d 851 (La.App. 2d Cir.1981), affirmed on other grounds, 422 So.2d 1109 (La.1982).
Furthermore, LSA-R.S. 32:171(A) provides in pertinent part that a driver shall stop "within fifty feet but not less than fifteen feet from the nearest rail of such railroad ... when ... a railroad train approaching within approximately nine hundred feet of the highway crossing emits a signal in accordance with R.S. 32:168, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard ... [or] [a]n approaching railroad train is plainly visible and is in hazardous proximity to such crossing."
The duties imposed on a railroad with regard to railroad crossings are set forth in LSA-R.S. 32:168 and LSA-R.S. 32:169 which provide that a train must blow a horn, which under normal conditions can be heard from a distance of 300 yards, for no less than 300 yards and until the crossing is reached. Furthermore, cross buck signs are required to mark the crossing not more than 50 feet nor less than 15 feet from the nearest rail.
The plaintiffs argue that Patricia Patten had no duty to stop in accordance with LSA-R.S. 32:171(A) since she did not hear the train's whistle warning nor plainly view the approaching train.
Ms. Burk and Ms. Patten both testified that it was impossible to see the train until the station wagon was too close to the crossing to stop. Also, they testified that they did not hear any horn being sounded by the train. However, plaintiffs admit the windows of the station wagon were closed, the radio was playing, and the air conditioner was running.
The conductor of the train, Thomas Duvall, who was stationed in the locomotive, and the engineer, Welch, both testified that the locomotive sounded its horn at the customary spot before reaching the crossing, although they admitted that a whistle post (which was used to designate the place the horn or whistle was to be sounded) had disappeared over the course of years.
More importantly, both Duvall and Welch testified that before the train was behind the trees, the abandoned store, and the weeds, a clear view could be had of the highway and that they therefore deduced a driver on the highway, such as Ms. Patten, had a clear view of the train. This clear view or "alley" was located some distance before the crossing and permitted the driver of the station wagon to have stopped at the crossing.
The question of whether the train sounded its horn for the required distance or whether Ms. Patten should have been able to plainly view the train under the prevailing conditions at this railroad crossing are questions of fact to be determined by the jury. In the process of arriving at its *520 findings of fact, it is within the purview of the jury to determine the credibility of witnesses and make reasonable inferences of fact. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973). As the cited cases hold, these evaluations are not to be set aside absent manifest error or unless the trier of fact is clearly wrong.
Ms. Burk and Ms. Patten both testified they could neither hear nor see the train. Welch and Duvall both testified that a clear view of the highway was afforded before the crossing, and that the locomotive sounded the horn before the train reached the crossing.
The jurisprudence provides that "negative testimony that a person did not hear a warning sign will not prevail over positive and credible testimony that such a warning signal was displayed." Lagrange, supra, at 1159. The testimony of the train conductor and engineer established that the train did sound its horn for the required distance before reaching the crossing. Although employees of the defendant are considered interested parties, their testimony cannot be disregarded in the absence of evidence to show that they are not worthy of belief. Lagrange, supra.
We find that the testimony of Welch and Duvall, together with the expert testimony of Sylvanius Walker set forth above, is sufficient evidence from which the jury could arrive at the reasonable inference that the occupants of the station wagon, which was travelling along the highway, should have seen the train in time to stop. Further, the jury could arrive at the conclusion that although the train sounded its horn, the occupants failed to hear it. Thus, the jury was free from manifest error in coming to the conclusion that Illinois Central Gulf was not at fault. As that conclusion is not clearly wrong, we must affirm.
The plaintiffs' third assignment of error alleges the trial court erred in prohibiting plaintiffs' expert from testifying as to his opinion regarding the unreasonably dangerous nature of the railroad crossing. The trial court refused to permit the expert's opinion on whether the crossing was unreasonably dangerous, stating that the ultimate determination of the nature of the crossing was a decision to be made by the jury based on all the evidence, including lay and expert testimony.
We recently addressed the issue of expert opinions in Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1st Cir.1987), writs denied, 520 So.2d 750 (La. 1988) as follows:
To warrant the use of expert testimony, two elements are required; these concern the subject of the expert's opinion or inference, and the qualifications of the tendered witness, respectively. First, "the subject of the inference must be so distinctly related to some science, profession, business or occupation as to be beyond the understanding of the average layman." State v. Wheeler, 416 So.2d 78, 80 (La.1982) (emphasis added). Second, "the witness must have sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier of fact in his search for truth." Id.; McCormick on Evidence § 13 at 33 (Cleary 3d ed. 1984). The inquiry is: "On this subject can a jury receive from this person appreciable help?" J. Wigmore, Evidence § 1923 at 29 (Chadbourn rev. 1978) (emphasis in original). If not, the testimony is superfluous, and is excluded to save time and avoid confusion. Id., § 1918 at 11.
There are several variables which the trial judge should consider in deciding whether to admit expert testimony. First, the opinion rule operates to prefer more concrete description by a witness to the less concrete, the direct form of statement by a witness to the inferential. Second, the purpose for which testimony is admitted should have an effect upon the degree of concreteness required. If admitted as to collateral matters, evidence in general terms may be received with relative freedom. However, as to more crucial matters, approaching the hub of the issue before the fact-finder, concrete details rather than abstract references or opinions are required. Third, *521 the preference for direct, concrete testimony and the reluctance to admit opinions and inferences as to matters crucially at issue are somewhat relaxed if the opinion or inference to be expressed may be classified as expert testimony. State v. Wheeler, supra, 416 So.2d at 80, 82; McCormick on Evidence, supra, § 12 at 26.
Testimony in the form of an opinion or inference otherwise admissible should not be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. See State v. Birdsong, 452 So.2d 1236, 1242-43 (La.App. 2d Cir.), writ denied, 457 So.2d 1200 (La.1984); Gage v. St. Paul Fire & Marine Ins. Co., 282 So.2d 147, 151-52 (La.App. 3d Cir.), writs denied, 284 So.2d 602 (La.1973); Bonilla v. Arrow Food Distribs., Inc., 202 So.2d 438, 444, 447 (La.App. 4th Cir.), writ denied, 251 La. 399, 204 So.2d 577 (1967). See also McCormick on Evidence, supra, § 12 at 31, § 13 at 33. However, before such opinions can be admitted, expert testimony must be warranted and admissible, and its probative value must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See, e.g., State v. Ludwig, 423 So.2d 1073, 1078 (La.1982); State v. Stucke, 419 So.2d 939, 945 (La.1982); State v. Moore, 278 So.2d 781, 786 (La.1973) (on reh'g).
A trial judge has broad discretion in determining who should or should not be permitted to testify as an expert and whether expert testimony is admissible; his judgment will not be disturbed on appeal unless manifestly erroneous. See State v. Trosclair, 443 So.2d 1098, 1105 (La.1983); Brown v. Morgan, 449 So.2d 606, 608 (La.App. 1st Cir.1984). (Footnotes omitted.)
We find that the issue of whether a railroad crossing is "ultra-hazardous" or a "dangerous trap" is not beyond the understanding of the average layman. As set forth above, a railroad crossing is not "ultra-hazardous" or a "dangerous trap" where a motorist can view the approaching train without placing himself in a position of peril dangerously near the tracks. The jury was as capable as the expert to evaluate the evidence concerning the visibility of the train. Moreover, the expert's testimony was tantamount to an opinion that the railroad was negligent.
Based on these facts we conclude that the trial court did not err in refusing to permit plaintiffs' expert to give opinion testimony as to the ultimate fact of whether he considered the railroad crossing "ultra-hazardous" or a "dangerous trap."
It is plaintiffs' fourth contention that the trial court erred in allowing the defendant to play a video taped recreation of the accident for the jury.
The video tape in question was introduced in connection with the testimony of defendant's expert, Mr. Razak. The defendant contends that the tape was necessary to aid in explaining his calculations as to how Ms. Patten could have stopped her vehicle before colliding with the train. The video tape depicted a scale model of the immediate area surrounding the railroad crossing, as well as Ms. Patten's car and the defendant's train. The model also included the abandoned store, poles, signs and trees located according to the measurements made by the plaintiffs' expert, Dr. Fogerty. Using computer linked cables programed with a train speed of 38 m.p.h. and a car approach speed of 40 m.p.h., the train and car were propelled forward recreating the accident.
Prior to showing the video tape, Mr. Razak stated in his testimony as follows:
I made no attempt to have the model represent an actual visibility. ... I do not reproduce in the model that which a driver could actually see. It is not intended to be a reproduction in every small detail of every item except the tree is in the scale location. The post is in the scale location. The building is in the scale location....
* * * * * * *522 The tape does not purport to represent what the driver, either of the train or the car, could see. ... It's taken from a remote observation point. ... You're getting an overall view of the combined actions in showing the distance/time relationship....
* * * * * *
The first scenes show the collision from two different vantages. The second two scenes from the same vantage point show the car coming to a stop after a reaction time of two and a half seconds and a visibility sighting point as per this diagram.
After Mr. Razak's explanation of the tape, plaintiffs' counsel, in the presence of the jury, was allowed to state his objections to the tape and point out to the jury those areas wherein the plaintiffs considered the tape inaccurate. Plaintiffs' counsel was also given the opportunity to conduct exhaustive cross-examination of Mr. Razak.
Finally, the judge instructed the jury on the limited purpose of the tape, pointing out that the reenactment did not purport to relate directly to the visibility as seen either by the train or the car. He further instructed the jury that the tape should be weighed the same as other testimony and that they could accept or reject the representations shown on the tape.
The admissibility of motion pictures or video tapes is largely within the discretion of the trial judge. Lafleur v. John Deere Co., 491 So.2d 624 (La.1986); Ashley v. Nissan Motor Corp. in U.S.A., 321 So.2d 868 (La.App. 1st Cir.), writ denied, 323 So.2d 478 (La.1975). In determining the admissibility of such demonstrative evidence, the trial court must consider whether the video tape accurately depicts that which it purports to represent and whether it will aid the jury's understanding. Ferguson v. Chrysler Corporation, 292 So.2d 791 (La.App. 1st Cir.1974). Against these factors the trial court must consider whether the video tape may mislead the jury or that its probative value is outweighed by its prejudicial effect.
We have viewed the video tape and find that the court did not abuse its discretion in permitting the jury to view it. Even assuming it was error to admit the video tape, it was harmless in light of the plaintiffs' opportunity to cross-examine Mr. Razak, the trial court's admonishment to the jury, and other direct testimony concerning Ms. Patten's visibility and opportunity to stop her vehicle.
The plaintiffs' fifth contention is that the trial court erred in prohibiting evidence of prior accidents at the crossing. We have previously held that testimony concerning prior accidents is admissible only where the prior accidents or injuries are closely related in circumstances to the injury or hazard at issue, and only for the limited purpose of showing that the plaintiff had notice of defects or physical conditions which are dangerous. Lincecum, supra. Compare Wilson v. Aetna Cas. & Sur. Co., 401 So.2d 500 (La.App. 2d Cir. 1981).
The plaintiffs sought to introduce evidence of two prior accidents which occurred at the same crossing where the plaintiff was injured. The first accident occurred in 1972 and involved a car travelling east and a train travelling south. The second accident occurred in 1983 and involved a car travelling west and a train travelling south. In the present case defendant's train was travelling north, and Ms. Patten's car was travelling east. The plaintiffs contend that the prior accidents are closely related in circumstances to the accident in the present case since all of the accidents occurred at the same crossing with the same railroad company.
We disagree. The evidence proffered by the plaintiffs failed to establish that either of the prior accidents involved substantially the same circumstances and conditions which caused the accident in the present case. Neither of the prior accidents involved the southeast quadrant of the intersection and are therefore irrelevant to the present case. We find no abuse of discretion.
Plaintiffs' final contention alleges trial court error in refusing to permit the *523 plaintiffs to introduce evidence of subsequent remedial measures which occurred at the railroad crossing where the plaintiff was injured. Plaintiff contends that the evidence was offered to prove the feasibility of precautionary measures.
In order to proceed expeditiously with the jury trial, the court instructed the defendant to proffer the evidence of subsequent remedial measures by way of post-trial deposition. The plaintiffs proffered the testimony of Mrs. Mattie Gayden, who has resided near the crossing for 46 years. Mrs. Gayden testified that subsequent to the accident she noticed that the track was abandoned for approximately four months and that after it was put back in use the trains travelled slower, the advance whistle warning was extended, and additional signs were posted warning that the track was back in use. Mrs. Gayden had no actual knowledge of which company was using the track, or who was responsible for posting the warning signs or why the operations on the track had been changed.
It is well established that evidence of changes, repairs, or corrective measures taken subsequent to an accident, for the purpose of preventing a similar recurrence, is inadmissible to show negligence or establish an admission of fault. Lea v. Baumann Surgical Supplies Inc., 321 So.2d 844 (La.App. 1st Cir.1975); writ denied, 325 So.2d 279 (La.1976).[3] The rule rests on the strong policy that persons should be encouraged to repair or correct conditions which are involved in accidents, and not be deterred therefrom by a rule which makes such actions an admission of prior fault or negligence. Id.
Plaintiffs contend that article 407 of the Proposed Louisiana Code of Evidence[4] does not require exclusion of subsequent remedial measures when offered for some other purpose, such as proving ownership, control, feasibility of precautionary measures, if controverted, or for attacking credibility.[5] We find no merit in this argument. *524 as the Proposed Code has yet to be enacted.
Where evidence of subsequent remedial measures is being offered for a purpose other than proving negligence, the court must closely weigh the relevance of the evidence against the risk that the evidence may be used for the prohibited purpose of inferring negligence. Furthermore, the determination of relevance is within the discretion of the trial judge, and his ruling will not be disturbed on appeal in the absence of a clear abuse of this discretion. State v. Chaney, 423 So.2d 1092 (La.1982).
The feasibility of performing precautionary measures is not a central issue in this case, nor was it controverted, it is therefore of little relevance. We find that the minimal relevance of this evidence in proving the feasibility of posting additional warning signs or slowing a train is far outweighed by the risk that it will be used by the jury to infer that the defendant was negligent. We therefore find that the evidence of subsequent remedial measures was properly excluded. Compare Boudreaux v. Exxon Co., U.S.A., 451 So.2d 85 (La.App. 3d Cir.), writ denied, 458 So.2d 119 (La.1984).
The judgment of the trial court is affirmed at appellants' cost.
AFFIRMED.
NOTES
[1] In Jenkins, infra, the court found a driver contributorily negligent where he had an unobstructed view of the tracks from 50 feet and where the train was sounding its whistle and had its headlight burning. The Jenkins court set forth the following summary of similar cases which we find pertinent to the case at hand:

In Hebert, supra, the driver of a pickup truck which was struck by a train at a crossing was held to be contributorily negligent where he had a view of 300 feet down the track from a distance of 45 feet from the track, and an unlimited view down the track when he was 20 to 25 feet from the track. The motorist in Glisson v. Missouri Pacific Railroad Co., 246 La. 470, 165 So.2d 289 (1964), from a point 48 feet from the track had a clear view for 380 feet and a partially obstructed view for at least 600 feet down the track, and was held to be contributorily negligent in failing to see an approaching train. In Bertrand, supra, the contributorily negligent driver's view was blocked by a grain truck parked near the track, but when the driver got within 50 feet of the track he had a clear view of the track for an almost unlimited distance. The driver in Theriot v. Texas & New Orleans Railroad Company, 220 So.2d 563 (La.App. 4th Cir.1969), writ denied 254 La. 142, 222 So.2d 886 (1969), from a distance of 80 feet from the tracks had an unobstructed view of the tracks for 500 feet, and at 15 feet had an unobstructed view as far as the eye could see. The court held there was no reason the driver could not have seen the train if he had looked, or heard the train if he had listened. In Madere v. Southern Pacific Transportation Co., 383 So.2d 456 (La.App. 4th Cir.1980), a motorist was held contributorily negligent where, in spite of trees and shrubs, at a distance of 25 to 50 feet from the track he could have seen the train approaching.
[2] In Lagrange, supra, and Kavanaugh v. Travelers Insurance Company, 203 So.2d 780 (La.App. 2d Cir.1967), the courts considered the motorist's familiarity with the prevailing conditions of the railroad crossing in concluding that the "dangerous trap" doctrine was inapplicable. In the instant case Mrs. Patten testified that she was familiar with the crossing and that she considered it a "rough" crossing.
[3] See also, Brooks v. St. Tammany Parish School Bd., 510 So.2d 51 (La.App. 1st Cir.), writ denied, 513 So.2d 821 (La.1987); Mobley v. General Motors Corp., 482 So.2d 1056 (La.App. 3d Cir.), writ denied, 486 So.2d 735 (La.1986); Holmes v. State, Department of Highways, 466 So.2d 811 (La.App. 3d Cir.), writ denied, 472 So.2d 31 (La.1985); Boudreaux v. Exxon Co., U.S.A., 451 So.2d 85 (La.App. 3d Cir.), writ denied, 458 So.2d 119 (La.1984); Thibodeaux v. Carlock, 392 So.2d 1084 (La.App. 3d Cir.1980); Esta v. Dover Corp., 385 So.2d 439 (La.App. 1st Cir.), writ denied, 392 So.2d 690 (La.1980); Galloway v. Employers Mutual of Wausau, 286 So.2d 676 (La.App. 4th Cir.1973), writ denied, 290 So.2d 333 (La.1974); Currier v. Saenger Theaters Corporation, 10 So.2d 526 (La.App. 1st Cir.1942); Givens v. De Soto Bldg. Co., 156 La. 377, 100 So. 534 (1924).
[4] Proposed article 407 reads as follows:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the sbusequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or for attacking credibility.
[5] While present Louisiana law is in accord with the first sentence of proposed article 407, prohibiting evidence of subsequent remedial measures to prove negligence or culpable conduct, we find very little jurisprudence in which evidence of subsequent remedial measures has been admissible for other purposes. We note only two decisions permitting the use of such evidence. On rehearing in Gauche v. Ford Motor Company, 226 So.2d 198 (La.App. 4th Cir. 1969), evidence of an automobile recall for corrective modification of the braking system was not considered admissible to prove negligence of the automobile manufacturer, but was considered admissible to corroborate other evidence of the existence of a defect in the braking system of the plaintiff's automobile. However, we note a subsequent Fourth Circuit decision which stated that:

[A] recall program cannot be used to prove that a defect existed in a particular vehicle at the time of a particular accident. However, once this defect is proved, then the fact that similar defects occurred in other vehicles made by the same manufacturer at approximately the same time is proper evidence to support the inference that this defect (proved by other evidence) existed when the automobile left the manufacturer's hands. Nevertheless, for reasons of public policy, evidence of or reference to the recall program itself is an improper method of proving similar defects. (Footnotes omitted).
Landry v. Adam, 282 So.2d 590, 597 (La.App. 4th Cir.1973).
Furthermore, in Toups v. Sears, Roebuck and Co., Inc., 507 So.2d 809 (La.1987), the Supreme Court concluded that the policy considerations which exclude evidence of remedial measures in negligence cases are not applicable where strict liability is involved. Rather, "[i]n a strict product liability case, evidence of such remedial measures should be allowed insofar as they are relevant in establishing what the manufacturer knew or should have known at the time of the injury." Id. at 816-817.