536 So.2d 755 (1988)
Cynthia Fontenot RICHARD, et al, Plaintiffs-Appellants,
v.
MISSOURI PACIFIC RAILROAD CO., et al., Defendants-Appellees.
No. 87-1114.
Court of Appeal of Louisiana, Third Circuit.
December 14, 1988.
*756 Morrow & Morrow, Patrick Morrow, Opelousas, for plaintiff-appellant, Celeste.
Guy Mitchell, Rick Albright, Ville Platte, for plaintiff-appellant, Cynthia.
Rozas, Manuel & McGee, A. Bruce Rozas, Mamou, Dubuisson & Dubuisson, Edward B. Dubuisson, Opelousas, for defendants-appellees.
Before STOKER, LABORDE and KING, JJ.
LABORDE, Judge.
Decedent, Kent Richard, was killed in a motorcycle/train collision. Richard's first wife filed suit on behalf of the two minor children born of that marriage. His second wife also filed suit on her behalf and on behalf of their minor son. Made defendants were Missouri Pacific Railroad (Missouri Pacific), Evangeline Parish Police Jury (Evangeline Parish), and the State of Louisiana through the Department of Transportation and Development (DOTD). The two suits were consolidated at trial and remain consolidated on appeal.[1] The plaintiffs asserted that Richard's death was caused by the negligence of all of the defendants in maintaining a dangerous railroad crossing. After a trial on the merits the trial court found that Richard's own fault was the sole cause of the accident and that none of the defendants were negligent. Plaintiffs were thus denied any recovery. All plaintiffs now appeal. We affirm.

FACTS
The facts of this case, as reproduced from the trial court's "Reasons for Judgment", are as follows:
"This is a suit in tort where the plaintiffs are seeking damages for wrongful death of Kent Richard as a result of a motorcycle train accident that occurred on April 11, 1983, in Evangeline Parish, on Parish Road 8-110, at approximately 12:30 P.M. The condition of the weather was a bright sunny day and the road was an asphalt hardsurface [sic] road.
The plaintiffs are Kent Richard's widow, Celeste Arlene M. Richard, individually and on behalf of her minor son, Kagen Brent Richard. Another plaintiff is Cynthia Fontenot Richard, on behalf of the minors Crystal Robin Richard and Kaleb Brian Richard. Cynthia Fontenot Richard was the deceased's first wife and of this marriage, Crystal Robin Richard and Kaleb Brian Richard were born.
The defendants in this case are the Missouri Pacific Railroad Company, the State of Louisiana, and the Parish of Evangeline.
The Evangeline Parish Road 8-110 leaves Chataignier Road in the City of Ville Platte, and proceeds east for several hundred feet and curves to the left going north before crossing the Missouri Pacific Railroad tracks. The road runs relatively straight for approximately 275 feet before it crosses the Missouri Pacific Railroad tracks. The road was designed and constructed by the State of Louisiana for the Police Jury, and was completed *757 on or about the 24th day of November, 1974, approximately 9 years before this accident.
The deceased, Kent Richard, was traveling east on the Parish Road 8-110 in the direction of the railroad crossing, and the locomotive and train belonging to the Missouri Pacific Railroad Company was traveling west from Opelousas to Ville Platte. The train was going approximately 20 miles per hour and slowing down for the intersection and the City of Ville Platte. The train was sounding its whistle before arriving at the intersection.
The deceased, Kent Richard, had a .2% alcohol reading as a result of a blood test performed after his death.
The evidence shows that the motorcycle, upon approaching the railroad tracks went into a skid, and was struck by the locomotive. Kent Richard was thrown on the north side of the tracks, which would mean he was almost across the tracks in a skidding position when he was struck by the locomotive and thrown to the opposite side from which he was approaching the tracks. Mr. Richard was apparently killed instantly."
On appeal plaintiffs contend that the trial court erred in finding that decedent's own fault, due to his intoxication, was the sole cause of the accident. Plaintiffs also argue that the court erred in not finding the intersection to be a "dangerous trap" and in not finding that the dangerousness of the intersection was at least a contributing cause of the accident.

DECEDENT'S NEGLIGENCE
Prior to trial, it was stipulated that the decedent's blood alcohol content was .2%. A person operating a motor vehicle with a blood alcohol content of .1% or above is considered legally intoxicated.[2] LSA-R.S. 14:98. Plaintiffs contend on appeal that the trial court's finding that decedent's intoxication was the sole cause of the accident or anything more than a minor cause of the accident is erroneous.
Defendants presented the testimony of two pathologists regarding the effects of a .2% blood alcohol content upon a person attempting to drive a motor vehicle. Dr. Ronald Padgett testified by deposition. He stated that such a person would suffer from impaired vision and hearing; diminished judgment; slowed reflexes and reactions; and distorted reality. Dr. Padgett also stated that such a person would be confused and lacking in clarity of his thought process. Dr. Albert McQuiwon testified at trial. He stated that a person with decedent's blood alcohol content would have a slowed reaction time, impaired vision, lack of coordination, and would be unable to make logical decisions.
Plaintiffs contend that the testimony of these experts is unreliable. They point to the testimony of friends and family of the decedent who saw him from the morning of the accident almost until its occurrence, yet saw no evidence of intoxication. They also point to the testimony of witnesses who saw the decedent purchase gas at a convenience store immediately prior to the accident, yet did not believe that the decedent acted like he was intoxicated or suffering from the deficiencies that the experts described.
The record indicates that after leaving the convenience store, the decedent passed a camper driven by Forrest Waddell, Jr. Waddell and the passengers in the camper testified that when he passed the camper decedent was travelling between 50-60 m.p.h. They testified that the decedent passed the camper as they approached the curve in the road (about 373 feet from the intersection) and at that time they could hear the train whistle blowing. After negotiating the curve, the decedent attempted to stop. He skidded for some distance and then attempted to lay the motorcycle flat on the ground to avoid colliding with the train. Plaintiffs presented expert testimony *758 that the length of the skid and gouge marks indicated that the decedent began his attempt to stop at about 120 feet from the intersection. However, the expert made these calculations assuming that the decedent would have had a "relatively fast" reaction time (even though he had a blood alcohol content of .2%) and that he was travelling about 40 m.p.h. (despite the testimony to the contrary).
Another issue is whether the plaintiff should have heard the train's whistle. In Glisson v. Missouri Pacific Railroad Company, 246 La. 470, 165 So.2d 289, 291 (1964), the court stated:
"The general rule of law is that a motorist approaching a railroad crossing must use his senses of sight and hearing for possible oncoming trains, before traversing the crossing. A motorist negotiating a railroad crossing is burdened with the responsibility of seeing and hearing that which he could have seen and heard, and he is presumed in law to have seen and heard what he could have seen and heard. If the motorist's view of the right of way is obstructed, he must exercise a higher degree of caution." (citations omitted.)
The testimony presented at trial indicates that all of the drivers and passengers of other vehicles approaching the intersection immediately prior to the accident heard the train whistle blowing well in advance of the intersection. The Missouri Pacific employees operating the train also testified that they sounded the whistle at the required point (the "whistleboard") as they approached the intersection. For some reason, probably because he was intoxicated, decedent either did not hear the whistle or chose to ignore it.
After considering the evidence presented at trial, the trial court stated in its "Reasons for Judgment":
"The real cause in fact or legal cause of the accident lies with the deceased driver's condition, having tested at .2% blood alcohol reading. This man would not or could not have stopped for the intersection even if the crossing would have been made at a 90 degree angle, or if there were any additional stop signs along the road way designating the crossing, and had been entirely free of trees or shrubbery or grass.
This Court is of the opinion the deceased was completely oblivious of what danger he was confronting at the intersection."
After thoroughly reviewing the record, we conclude that the trial court's finding that decedent's intoxication was the primary cause of the accident is not manifestly erroneous.

DANGEROUS TRAP DOCTRINE
The plaintiffs contend that the railroad crossing where the accident occurred was a "dangerous trap" and that the dangerousness of the crossing caused the accident. The dangerous trap doctrine was recently discussed by this court in Lagrange v. Missouri Pacific Railroad Company, 503 So. 2d 1158 (La.App. 3d Cir.1987), where we stated:
"The dangerous trap doctrine is a jurisprudentially created rule which states that if a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad will be held liable unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warning devices."
Id. at 1160.
As stated by the trial court, Parish Road 8-110 is an asphalt hard-surface road. About 373 feet from the intersection the road begins to curve. After that curve, there is a straightaway of about 261 feet that leads to the railroad crossing. There are no signs or signals marking the crossing other than the standard cross-buck sign located about 15 feet from the track. There are several trees located on the railroad's right-of-way and on the adjoining landowner's property.
Plaintiffs contend that the crossing constitutes a dangerous trap for several reasons. They claim that the 261 feet *759 straightaway is inadequate for an approaching driver to see that he is approaching a railroad crossing, ascertain whether there is a train approaching, and subsequently stop. They claim that there should be additional warning signs, railroad crossing gates, and a reduced speed limit sign to warn approaching motorists. Plaintiffs also contend that trees located on the railroad's right-of-way blocked approaching motorists' views of the railroad and thus prevented motorists from seeing an oncoming train.
Defendants point to "sight distance" measurements taken at the intersection as showing that it was not a dangerous trap. Defendants presented the expert testimony of G.L. Todd, a Civil Engineer and Land Surveyor. Todd took sight distance measurements on May 3, 1983. His measurements indicated that at a point 15 feet south of the crossing (the decedent approached the crossing from the south), the sight distance measurement was 1,320 feet; at 25 feet, 900 feet; and at 50 feet, 750 feet. Defendants also refer to photographs taken of the scene on the day after the accident which indicate that at a point 50 feet from the crossing, the sight distance was at least 300-400 feet down the track.
In comparing this data to sight distance findings recited in Lagrange, we find these distances to be very similar. In Lagrange we stated:
"Sight distances determined by the civil engineer show that from a position 15 feet from the tracks plaintiff could see 1,200 feet north on the tracks, at 25 feet he could see 731 feet, at 50 feet 418 feet, and at 75 feet 300 feet."
Id. at 1160. Lagrange, also cited Glisson, 165 So.2d at 292-93, where the evidence showed that at a distance of 48 feet from the tracks, the plaintiff could see 350 feet down the track. Neither the Lagrange nor Glisson courts found the railroad crossings to be unusually dangerous (dangerous traps).[3]
In Brackin v. Kansas City Southern, 331 So.2d 237 (La.App. 3d Cir.), writ denied, 334 So.2d 217 (La.1976), we held that a railroad crossing where a driver could stop his vehicle 9 feet from the edge of the track and have an adequate view of the track was not a dangerous trap. In the present matter it is clear that an approaching driver would not have to be nearly so close to the crossing to have an adequate view of an oncoming train.
In rejecting plaintiff's argument that the intersection was a dangerous trap, the trial court in the present case stated:
"This court has read the well written briefs of all counsel in this case, and of course, heard all of the testimony adduced by all parties. The Court visited the scene of the accident and observed the railroad crossing very carefully.
Having done all of the above, the Court is convinced the intersection in question was not a dangerous intersection, even though there may have been some imperfections, such as the road crossing the railroad tracks at an angle and finding there were some trees on the railroad right of way, as well as on the road right of way. However, there were more trees inside the property belonging to a landowner, which was outside the road right of way and railroad right of way. The Court further found there was a great distance of sight along the railroad tracks for an approaching vehicle to see a train approaching the crossing and to execute a safe stop had this driver been prudent. There was a railroad crossing sign at the intersection at the time of the accident, which should have warned even a stranger to the intersection that such a crossing was in existence."[4]
*760 After reviewing the evidence presented at trial, comparing that evidence to evidence in prior cases, and reviewing the trial court's reasoning, we hold that the trial court correctly found that the intersection was not a dangerous trap. It is clear that an approaching motorist would not have to place himself in a position of peril dangerously near the tracks before ascertaining if a train was approaching the crossing.
We find no evidence of negligence on the part of DOTD or Evangeline Parish in designing and maintaining the intersection. As to Missouri Pacific, the trial court found that the train was travelling at about 20 MPH and was in the process of slowing down at the time of the accident. As previously stated, the record indicates that the train whistle was blowing well in advance of the intersection. Thus we find no negligence on the part of Missouri Pacific.
For the foregoing reasons, the judgment of the trial court finding the accident to be solely the fault of the decedent and denying recovery to plaintiffs is affirmed. Costs of this appeal are taxed to plaintiffs.
AFFIRMED.
NOTES
[1] As to the consolidated suit (La. Judicial District 13, #41, 402-B), a separate judgment will be rendered on this date entitled Celeste Richard, et al. v. Missouri Pacific Railroad, et al., 536 So.2d 760 (La.App. 3d Cir.1988).
[2] Although the statutory presumption of intoxication applies only in criminal cases, a civil litigant may introduce evidence of a person's blood alcohol content and expert testimony interpreting its effects on a person's ability to operate a motor vehicle. Parker v. Kroger's, Inc., 394 So.2d 1178 (La.1981).
[3] See also Burk v. Illinois Central Gulf Railroad Co., 529 So.2d 515, 518 (La.App. 1st Cir.1988).
[4] It is unclear from the record as to how much of a "stranger" decedent was to the crossing. He lived in the area and had apparently traveled on the road before. We note that the dangerous trap doctrine would be inapplicable to a person who frequently used the crossing and was familiar with the prevailing conditions of the road. See Lagrange, 503 So.2d at 1160.