641 So.2d 557 (1994)
Mr. and Mrs. T.G. KRAMER, et al., Plaintiffs-Appellants,
v.
CONTINENTAL CASUALTY COMPANY, et al., Defendants-Appellees.
No. 92-1131.
Court of Appeal of Louisiana, Third Circuit.
June 22, 1994.
Order Denying Rehearing in Part, Granting Rehearing in Part, and Rendering Judgment September 2, 1994.
*559 J.B. Jones Jr., Cameron, for Mr. and Mrs. T.G. Kramer, etc.
Allen L. Smith Jr., Lake Charles, for Cyprien, Inc.
David Ramsey Lestage, DeRidder, for Walter Carrico.
Michael Steven Beverung, Donald Coleman Brown, Lake Charles, for Sheriff Wayne McElveen.
Henry Eugene Yoes, III, Lake Charles, for Robert Allen.
Thomas Walter Sanders, Lake Charles, for Independent Fire.
James Kirk Piccione, Lafayette, for Ry-Ron, Inc.
Before DOUCET, KNOLL, COOKS, SAUNDERS and DECUIR, JJ.
KNOLL, Judge.
This appeal concerns the liability of a motel for allowing minors to become intoxicated, then forcing the minors to leave and drive in an intoxicated condition, which resulted in one of the minors receiving serious injuries from an automobile accident that occurred within minutes after leaving the motel. For reasons which follow, we reverse the jury verdict and find liability against the motel.
The automobile accident at issue occurred on New Year's Eve of 1987 in Lake Charles, Louisiana after a group of teenagers were told to leave the Downtowner Motel where they had gathered for a party in a private room. Shortly after leaving the Downtowner, 16 year old Shannon Kramer was severely injured while riding as a passenger in an *560 automobile driven by 17 year old John Carrico.
Shannon, John, and two other passengers had been to a party at the Downtowner where alcoholic beverages were consumed. Deputies Eugene Victor and Russell T. Fry, two uniformed, off-duty Calcasieu Parish Sheriff's officers who were moonlighting as security guards for the Downtowner, instructed them to leave the motel. A few minutes later, John lost control of his car on a wet street and struck a tree. Shannon sustained serious injuries, including a serious closed head injury which left her permanently impaired.
Mr. and Mrs. T.G. Kramer, individually and on behalf of their minor daughter, Shannon, sued for damages. After all pleadings had been filed, the defendants included Cyprien, Inc., d/b/a Downtowner Motel (Downtowner), its insurer, Transportation Insurance Company (Transportation Insurance); John Carrico, his father, Walter Carrico, and their insurer, State Farm Mutual Automobile Insurance Company (State Farm); Deputy Victor, Deputy Fry, and Sheriff Wayne McElveen and their insurers, Anglo American Insurance Company (Anglo American), Walbrook Insurance Company (Walbrook), LUI Syndicate, Inc. (Syndicate), and Calfed Syndicate, Inc. (Calfed).
Ry-Ron, Inc. (Ry-Ron), the Kramers' health care insurer, intervened, seeking reimbursement of medical expenses paid for the treatment of Shannon's injuries. The Downtowner filed a third-party demand against Sheriff McElveen and his insurers.
The trial of this case was bifurcated. The trial judge tried the Kramers' claims against Sheriff McElveen, as well as the Downtowner's third-party demand against him. However, near the close of the trial, the Kramers dismissed their claims against Sheriff McElveen without prejudice and ultimately the Downtowner's third-party demand against the Sheriff was likewise dismissed.
A jury tried the various remaining claims and returned a verdict on September 20, 1991, assigning 80% of the fault for the accident to John Carrico, 15% to Shannon, and 5% to Shannon's mother, Mrs. T.G. Kramer. The jury found the Downtowner and the off-duty deputies free from fault. The jury awarded damages for Shannon's injuries in the amounts of $197,254.91 for past medical expenses, $200,000 for future medical expenses, $150,000 in general damages, and $250,000 for impairment of future earning capacity, or a total of $797,254.91. The jury awarded Mr. and Mrs. Kramer each $50,000 for their loss of consortium. After the jury returned its verdict, there is a minute entry which indicates that the Kramers and Ry-Ron dismissed their claims against the Carricos and State Farm.
The Kramers and Ry-Ron then moved for JNOV on the issues of liability and damages, or alternatively, a new trial or an additur. The trial court denied the motion insofar as liability, but granted it with respect to quantum. It raised the award for future medical expenses to $750,000, impairment of future earning capacity to $563,570, and general damages to $1,000,000. Because the jury verdict absolved the Downtowner and the deputies, and because the trial court denied the Kramers' motion for JNOV with regard to liability, the JNOV was rendered only against John and Walter Carrico.
The Kramers and Ry-Ron appeal, arguing that the jury's rejection of their negligence action against the Downtowner, the deputies and their insurers, and its apportionment of fault are manifestly erroneous. The defendants answered the appeal, arguing that the jury's damage award was excessive, that the trial court erred in increasing the damages and in granting a JNOV when the Carricos, the only defendants found at fault by the jury, had been dismissed from the lawsuit.

FACTS
On New Years Eve of 1987, the Downtowner rented two rooms to two high school under age boys. It was common knowledge among the underage teenagers that they could easily rent rooms at the Downtowner to party and drink alcoholic beverages. Helen George, the desk clerk on duty at the time in question, testified that 16 year old Cary Sole presented false identification which indicated that he was 23 years of age; Sole denies this. He was rented room 229. At a *561 different time, Greg Cavenah, 17 years of age, was rented room 225; there was no testimony that he was asked to produce any identification. Cavenah testified that he rented the room for Shannon and her friends who had pooled their money.
At approximately 8:00 p.m., a number of high school students began to congregate in the rooms. Shannon and several of her fellow cheerleaders at Barbe High School were among the students. Earlier in the evening, when Shannon's friend, 16 year old Adrienne Davenport, picked her up, Shannon and Adrienne told an untruth to Mrs. Kramer about their plans for the evening.
The exact number of teenagers who attended the party was disputed. The Kramers presented evidence that there were between 15 and 50 students; the defendants contended that there were approximately 100. The record shows that the teenagers brought in and consumed a variety of alcoholic beverages, including at least one 16 gallon keg of beer which Sole and his friends paraded past the front desk clerk and owner of the motel, through the motel lobby to their room.
The Downtowner regularly hired off-duty, uniformed Calcasieu Parish Sheriff's deputies as security guards, and on this New Year's Eve Deputies Victor and Fry were hired in this capacity. While responding to several complaints about the teenage partygoers at the Downtowner, the deputies observed the teenagers holding alcoholic beverages. The beverages consisted of beer, wine coolers, and hard liquor, such as vodka and rum. After receiving several complaints, the management of the Downtowner instructed the deputies to evict the teenagers.
The deputies, accompanied by the manager of the motel lounge, Wayne Sensat, went up to the second floor balcony to disperse the crowd of teenagers which had congregated there and in the two rooms rented to Cavenah and Sole. Deputy Fry testified that he went to room 229, Sole's room; he told them that only the four registered guests could remain and that all unregistered guests had to leave. He further told the kids on the balcony that if they were not registered guests that they had to leave. Fry stated that he never went to room 225 and as far as he knew, no one in room 225, the one registered to Cavenah for Shannon and her friends, was told that they could remain if they were registered guests. The record further shows that prior to instructing the students to leave, the deputies became aware that at least some of them were minors and that some had been drinking alcoholic beverages.
The record shows that it had been raining on the night of the accident, and the streets were wet. Shannon got into John's car, seated herself in the passenger seat crosswise on the lap of Phillip Hoffpauir, and disengaged the shoulder harness from around her. John left the Downtowner parking lot and drove along Lakeshore Drive and Shell Beach Drive. He missed his intended turn on Lake Street and took an alternate route, turning left at the next available street and left again on to Sallier Street. On Sallier Street he passed an automobile. After returning to his lane, he encountered an s-curve where Sallier Street crosses a set of railroad tracks and then runs parallel to the tracks on the opposite side. Somewhere in this area, he lost control of his vehicle and skidded on the wet pavement into a tree. Shannon, unprotected by the passive shoulder restraints, was forcefully propelled forward, and suffered profound neurological injuries, among others.

STANDARD OF REVIEW
We recognize from the outset that our standard of review as outlined in various recent Louisiana Supreme Court decisions is under the manifestly erroneous or clearly wrong standard. However, we hasten to point out the difficulties we face when we try to apply these rules to tort cases which were not framed in proper jury interrogatories for the jury in terms of a duty/risk analysis of liability.
In the present case, the jury interrogatories were worded so that the liability of the various defendants could be ascertained by answering the question, which was repeated for each defendant, of whether they were guilty of negligence which was the proximate cause of the injuries Shannon suffered. As *562 was the case in Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984), we find it troublesome that because of the formulation of the jury interrogatories, we do not know how the jury resolved the elements of the duty/risk formulation.
When we are presented with complex factual litigation, as in the case sub judice, which involves multiple potential tortfeasors involved in the litigation in which the question of liability can hinge on any of the elements of the duty/risk formulation, a general jury interrogatory makes it virtually impossible for us to give credence to the jury's findings. Nonetheless, we have attempted herein to focus, as best we can, on the various elements of duty/risk and to analyze the defendants' liability in light of the manifestly erroneous standard, where applicable.

SECURITY GUARDS: INDEPENDENT CONTRACTORS OR DOWNTOWNER EMPLOYEES
Because of the manner in which we have chosen to review the jury's liability determinations, it is necessary for us to first address the Downtowner's contention that the security guards were independent contractors and not their employees. Since the jury concluded that the security guards, Victor and Fry, and the Downtowner, were not negligent, it did not reach this issue. Accordingly, we are determining this question for the first time in this litigation.
In Blair v. Tynes, 621 So.2d 591 (La.1993), the Louisiana Supreme Court held that an American Legion post in Washington Parish was vicariously liable for the actions of the Washington Parish deputies it hired to direct traffic at a fund raiser it held. In Blair, the question of whether the security guards were independent contractors was specifically addressed. There the Louisiana Supreme Court held:
"A determination as to whether a borrowed employee becomes the special employee of the borrower requires an assessment of inter alia, the level of supervision exercised by the borrower over the borrowed employees and whether the purported special employer has the authority to fire the person from the special employment position.
* * * * * *
In Lejune [LeJeune] v. Allstate Ins. Co., 365 So.2d 471 (La.1978), we addressed the issue of whether the general employer of a negligent employee remained liable for its employee's tort despite the fact that the employee had been borrowed to perform services for a special employer at the time of an accident.... The Legion argues that it was not the special employer of the deputies, suggesting that the deputies were independent contractors. This contention however overlooks David Rester's [the American Legion's facilities manager] power to hire and schedule the deputies, his power to decide how many deputies should be hired as provided for in the lease agreement, as well as his power to assign the deputies to perform particular duties." Id. at 599 (Citations omitted.)
William Woodward, the sole owner of stock in Cyprien, Inc., the corporation which operates the Downtowner, testified that the motel determined when the security guards would work, as well as how they would work. The record shows that the motel hired Victor and Fry at a wage of $10 per hour and determined when their services were needed. Woodward further stated that as problems arose, the motel management instructed the deputies to take care of it. Furthermore, Woodward testified that if the security guards failed to follow motel management's instructions, they would be fired.
Considering the economic relationship of the security guards and the Downtowner in light of Blair, we find that an employer-employee relationship existed between Victor and Fry and the Downtowner. Accordingly, for purposes of our analysis of liability for Shannon's injuries, we will treat the security guards as the Downtowner's employees.

PREFACE TO NEGLIGENCE DETERMINATION
We have chosen to limit the scope of our discussion of the Downtowner's negligence, focusing on the actions of management and employees when the young persons, who *563 went to the motel, congregated openly on the second floor balcony and in rooms 225 and 229. However, in making this decision, we nonetheless feel compelled to highlight certain preceding facts which cause us to pause and lend understanding to our formulation of the duty question in the present case.
On the night of Shannon's accident, the record shows that at least three different teenage parties convened at the Downtowner specifically for the purpose of drinking alcoholic beverages, because these individuals were too young to enter bars. These teenage parties included Sole's, Shannon's and an unidentified teenage group. We further note that in addition to the keg of beer in room 229, Sole testified that when he entered the motel, he saw another group of young persons in the Downtowner parking lot with another keg of beer in their vehicle.
In the course of the trial, we likewise note that the Downtowner management and other witnesses admitted that its rooms were used from time to time by teenagers for parties; however, it said that it discouraged such actions because of the noise problem that these persons presented. In order to discourage teenagers from renting rooms, the Downtowner's sole stockholder stated that the desk clerks are instructed to ask for identification of those persons who appear to be under 18 years of age. Despite this purported policy, the record before us establishes that Cavenah, a 17 year old, was not asked for identification when he rented room 225 on New Year's Eve. And, Sole, the 16 year old who rented room 229, steadfastly denied the testimony of the desk clerk that he presented false identification that he was 23 years of age. Considering the absence of any corroborative evidence, i.e., a photocopy of his identification card, a procedure identified in use at the motel, we cannot say that the motel clerk's version is more believable. Accordingly, the conclusion which we inescapably draw is that the procedure employed by the Downtowner to discourage room rental to minors was not consistently utilized and when used it was inadequate to achieve the desired results. Instead, we are left with the distinct impression that economics was the overriding concern of the Downtowner.

LIABILITY OF THE DOWNTOWNER
The Kramers and Ry-Ron contend that the jury was manifestly erroneous in its conclusion that the security guards and the Downtowner were not negligent. They argue that the Downtowner owed Shannon a high degree of care since it provided security and that it owed her a duty commensurate with that owed to guests since it knew or should have known that high school students, too young to enter bars, would have parties at the motel in order to drink alcoholic beverages on New Year's Eve.
They further argue that when the Downtowner's security guards discovered that some minors were consuming alcoholic beverages, they, as knowledgeable law enforcement officers, had a duty to detain all of the students and to take those who were minors into custody. As a corollary to that argument, they contend that under these circumstances, the security guards and the Downtowner, as their employer, were negligent in putting these minors out and forcing them to drive when they knew they had been drinking.
The defendants' position is threefold: (1) the security guards never saw persons drinking alcoholic beverages in room 225, the room associated with Carrico and Shannon; (2) if there was drinking, neither security guard saw anyone who appeared intoxicated; and, (3) the only option they had available to them was to evict the teenagers.
The liability of the Downtowner and its security guards must be determined under a duty/risk analysis. Harris, supra. The pertinent elements of legal liability in negligence cases include: (1) whether the conduct of which plaintiff complains was a cause-in-fact of the harm; (2) whether there was a duty on the part of the defendant which was imposed to protect against the risk involved; (3) whether there was a breach of that duty; and, (4) damages. Gresham v. Davenport, 537 So.2d 1144 (La.1989).
Cause-in-Fact. The jury's determination of cause-in-fact is factual. Harris, supra. Louisiana jurisprudence recognizes that an appellate court will give great deference *564 to a jury's factual determinations. Canter v. Koehring Company, 283 So.2d 716 (La.1973). For reasons which follow, if the jury concluded that the actions of the Downtowner and its security guards were not a cause-in-fact of Shannon's accident, we find such a conclusion manifestly erroneous.
The initial inquiry in a determination of actionable negligence on the defendant's part is whether any causal relationship existed between the harm to the plaintiff and the defendant's allegedly negligent conduct. Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298, 302 (1962), explained cause-in-fact as follows:
"Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm.... [T]he negligent conduct is undoubtedly a substantial factor in bringing about the collision if the collision would not have occurred without it. A cause-in-fact is a necessary antecedent. If the collision would have occurred irrespective of the negligence ..., then his [defendant's] negligence was not a substantial factor or cause-in-fact...." (Footnotes omitted.)
Elaborating further, in Ganey v. Beatty, 391 So.2d 545, 547 (La.App. 3 Cir.1980), we stated:
"To determine cause-in-fact, courts will carefully scrutinize all the evidence, and those acts will be adjudged causes-in-fact when it is found that more probably than not they were necessary ingredients of the accident. Stated otherwise, an act will be deemed a cause-in-fact of an accident only when, viewed in the light of all the evidence, it is concluded that it is a substantial factor without which the accident would not have happened."
In the case sub judice, we must make a two-fold determination: (1) was Carrico intoxicated and was his intoxication at least a cause of Shannon's injuries, and (2) but for the Downtowner's handling of the teenagers, would Shannon have been injured.
The defendants first contend that the Kramers failed to establish that Carrico was intoxicated and that his intoxication was a cause of the accident. They argue that the Kramers cannot rely on the legal presumption of intoxication based on a blood alcohol of 0.1 percent or more, Carrico's was .15 percent, since this presumption is not applicable in civil proceedings. Instead, they assert that it was incumbent upon the Kramers to introduce competent expert testimony to establish whether Carrico's blood alcohol level would result in intoxication and the effects that the intoxication would have on his ability to operate a motor vehicle. We disagree that expert testimony was required.
In Whittington v. American Oil Co., 508 So.2d 180, 186-187 (La.App. 4 Cir.1987), writ denied, 512 So.2d 436 (La.1987), our fellow judges of the Fourth Circuit summarized the law on this issue as follows:
"There is no statutory presumption of intoxication in civil matters. The finding of a specific blood alcohol content standing alone is not evidence that an individual is incapable of operating a motor vehicle and does not preclude recovery for damages caused by the negligent act of others.
The mere showing that one has imbibed alcohol prior to involvement in an automobile accident does not per se establish negligence contributing to the accident." (Citations omitted.)
Nevertheless, the Third Circuit has held that although blood alcohol content alone is insufficient to establish causation, corroborative evidence other than expert testimony is sufficient to show that alcohol was a causal factor contributing to the accident. In McDaniel v. DeJean, 556 So.2d 1336 (La. App. 3 Cir.1990), there was no expert testimony presented at trial on the effects of alcohol impairing the defendant's driving ability. Instead, we examined the record as a whole to see whether there was corroborative evidence that intoxication was a cause-in-fact of the accident. In McDaniel, the arresting officer testified that defendant's eyes were bloodshot, that he smelled of alcohol, that he was unsteady on his feet, and that he failed the field sobriety test. When we examined this testimony together with defendant's.11 percent blood alcohol content, we *565 found that "the evidence preponderate[ed] that his intoxication was a cause in fact of the accident." Id. at 1340.
Likewise, in Duplechain v. Old Hickory Cas. Ins. Co., 594 So.2d 995 (La.App. 3 1992), we addressed a similar issue. In Duplechain, the defendant stopped his car at night in the middle of the road, exited, and began arguing with his wife. The plaintiff was injured when his vehicle collided with defendant's stopped automobile. Defendant's blood alcohol level was .24 percent. Even though the trial court referred to evidence of the amount of alcoholic beverages which must be consumed to reach a .24 percent level, it did not mention any expert testimony about the effects that alcohol consumption had on the defendant's driving ability. Viewing the events preceding the accident with defendant's blood alcohol level, we concluded that defendant's intoxicated condition was a cause-in-fact of plaintiff's injuries.
In the present case, the record establishes that Carrico drove to the Downtowner at approximately 8:00 p.m., bringing with him a twelve-pack of beer and a bottle of Vodka. The record likewise shows that after he arrived at the Downtowner, Carrico left with friends and obtained additional alcoholic beverages.
The litigants stipulated that the accident occurred at 10:50 p.m. and that when Carrico's blood sample was drawn at St. Patrick Hospital at 12:20 a.m., an hour and a half after the accident, his blood alcohol level was.15 percent. Carrico testified that he was 17 years of age at the time of the accident and that he started drinking as soon as he arrived at the Downtowner. Carrico further stated that he remembered having two beers and two Vodka 7-Up mixtures. He likewise stated that he did not drink any alcoholic beverage after he left the Downtowner.
We find that Carrico's youth and the obvious determination that minors cannot safely handle alcohol, combined with the facts elaborated upon herein and Carrico's .15 percent blood alcohol level, should have provided the jury with sufficient evidence to conclude that Carrico was intoxicated and that his intoxication was a contributing factor to the accident.
Now we turn to the broader question of whether the Downtowner's actions were a cause-in-fact of the accident. Carrico testified that the group he was with at the Downtowner definitely looked under age to be drinking and there were obviously drunk people among them when the security guards told them to leave the Downtowner at approximately 10:30 p.m. He also stated that he was not ready to leave the motel when the security guards told them to leave, and that until they were ejected, he always felt that he had an option to stay at the motel if he thought he was too drunk to drive.
Based on the evidence outlined above and infra, we further find that "but for" the Downtowner's actions in allowing Carrico and the other minors to possess and drink alcoholic beverages on the motel premises and in having Carrico and the other minor partygoers leave the Downtowner in the manner detailed herein, the jury should have had sufficient evidence to conclude that these were additional substantial factors without which Shannon's accident would not have happened.
Existence of a duty. A duty in negligence cases may be defined as an obligation to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. Gresham, supra at 1147, quoting Prosser and Keeton on The Law of Torts (5th ed. 1984). Whether defendants owe plaintiffs a legal duty is a question of law. Phillips v. K-Mart Corp., 588 So.2d 142 (La.App. 3 Cir.1991).
In the often cited case of Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133, 137 (1971), the Louisiana Supreme Court, elaborating on the basis of legal duty, stated:
"Hence it becomes clear that in the decision of a case in tort or delict in Louisiana, the court first goes to that fountainhead of responsibility, Articles 2315 and 2316, and in applying those articles it goes to the many other articles in our Code as well as statutes and other laws which deal with the responsibility of certain persons, the responsibility in certain relationships, and the responsibility which arises due to certain *566 types of activities. Just as we have found in the Code many standards of conduct, many statutes and local ordinances also detail standards of conduct which courts may apply per se, impliedly or by analogy. Criminal laws, traffic regulations, zoning laws, health laws, and others may and often do set the standard for lawful conduct in personal relationships, although they are designed for societal protection and incorporate penalties and specific consequences for their mere breach."
We now consider the argument of the Kramers and Ry-Ron that the Downtowner owed Shannon a high degree of care since it owed her a duty commensurate with that owed to guests, since it knew or should have known that high school students, too young to enter bars, would have parties at the motel in order to drink alcoholic beverages on New Year's Eve.
To the contrary, the Downtowner asserts that it owed Shannon a duty of ordinary or reasonable care because she was not a registered guest, but merely an invitee to whom the motel owes reasonable or ordinary care.
From the outset, we find it necessary to comment on the Downtowner's assertion that Shannon was an invitee and that this classification should be determinative.
In Shelton v. Aetna Casualty & Surety Company, 334 So.2d 406, 410 (La.1976), the Louisiana Supreme Court stated:
"Traditionally the duties of an owner or occupier of land, for the purpose of determining liability in negligence actions brought under articles 2315 and 2316 of the Louisiana Civil Code, have been defined in terms of the status of the person entering the land. This was the approach utilized by both the district court and the court of appeal in the instant case. Recently, however, this Court in Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La.1976) noted that `[w]e find the common law classifications of invitee-licensee-trespasser to be of little help in applying C.C. 2315.' In so stating, we indicated that the proper test to be applied in determining a landowner's liability under articles 2315 and 2316 of the Civil Code is `"whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others,'" and, as we related, `"although the plaintiff's status as a trespasser, licensee, or invitee may in light of the facts giving rise to such status have some bearing on the question of liability, the status is not determinative.'"
Thus in determining the duty owed by Merle Shelton [the defendant] to his mother [the plaintiff] it is ... not necessary to classify Mrs. Shelton as an invitee or licensee, but rather it is appropriate to ascertain this duty by examining the particular facts before us." (Citations omitted.)
Thus, in the present case, we do not find it necessary to classify Shannon as an invitee or licensee, and instead examine the question of legal duty owed in light of the duty/risk formulation. Furthermore, we do not reach the question of whether the Downtowner's duty was ordinary or high, since we find it breached even an ordinary duty of care.
Accordingly, we next consider the assertion of the Kramers and Ry-Ron that the Downtowner owed Shannon a duty based on its responsibility to enforce the drinking laws applicable to minors. In brief, the Downtowner, the security guards and their insurers contend that the public duty doctrine precludes finding that they owed a duty to Shannon.
The "public duty doctrine" was succinctly explained in Fusilier v. Russell, 345 So.2d 543 (La.App. 3 Cir.1977), writ denied, 347 So.2d 261 (La.1977), where Evangeline Parish deputies were sued for failing to arrest an intoxicated man who afterwards injured the plaintiff. In Fusilier at 546, we stated:
"We hold that a police officer's duty to make arrests is owed to the general public and not to individuals. Unless the plaintiff can prove facts which show that the defendant owed him a special duty outside of the one owed to the general public, he cannot recover."
Commenting on the "public duty doctrine," the Louisiana Supreme Court stated in Stewart v. Schmieder, 386 So.2d 1351, 1357 (La. 1980):

*567 "The `public duty doctrine' has come under considerable attack in recent years. It has been called `in reality, a form of sovereign immunity.' Adams v. State of Alaska, 555 P.2d 235, 241 (Alaska 1971 [1976]). One court has said that it sets up just the type of `proprietary' and `governmental' distinction that was disposed of by the abolition of sovereign immunity. Coffey v. City of Milwaukee, [74 Wis.2d 526], 247 N.W.2d 132 (Wis.1976). It has also been criticized because it places the costs of inadequate performance on the shoulders of the innocent victims of official neglect, rather than spreading the costs of such neglect throughout society. 39 Albany L.Rev. 599, 601 (1975). The doctrine is also said to be predicated largely upon the erroneous assumption that, without it, a municipality would be subjected to crippling judgments because of the negligence of its employees, a fear which also hampered the abrogation of sovereign immunity. 13 Colum.J.L. and Social Problems 303 (1977). The doctrine also has the effect of removing a great deal of the incentive for public bodies to see that the functions of government are carried out responsibly and with reasonable care. The need for governmental responsibility in the modern world was a major factor in this court's action in abandoning the doctrine of sovereign immunity in Board of Commissioners of the Port of New Orleans v. Splendour Shipping & Enterprises Co., 273 So.2d 19 (La.1973). It is noteworthy that in a number of states where the doctrine is applied it has been seriously eroded in recent years. See, e.g., Oleszczuk v. State of Arizona, 124 Ariz. 373, 604 P.2d 637 (1979); Sanchez v. Village of Liberty, 49 A.D.2d 507, 375 N.Y.S.2d 901 (1975).
* * * * * *
We have ... in many instances, held governmental entities or public officials liable for the breach of duties which, at first blush, appear to be owed to the public rather than any individual.
* * * * * *
Therefore, under the jurisprudence of this state, the mere fact that a duty is of a public nature, and benefits the general public, does not require a conclusion that the city cannot be found liable for the breach of that duty.
In addition, we note that in jurisdictions where the `public duty doctrine' is applied, it is subject to the important exception that liability can be founded upon the violation of a duty that would be generally considered to be owed to the public, if the statute or ordinance setting forth the duty indicates, by its language, that the duty is designed to protect a particular class of individuals." (Citations omitted.)
In Stewart a personal injury damage suit was brought by injured construction workers or the families of killed construction workers against the City of Baton Rouge and the Parish of East Baton Rouge following the collapse, during the final stages of construction, of a building where they were working. The plaintiffs contended that the City-Parish was liable because of its duty to examine construction applications to determine if the plans are safe. Based on the legal reasoning enunciated hereinabove, the Louisiana Supreme Court held that the statutory scheme under which building permits were issued created a special duty to insure the safety of persons constructing those buildings.
With Langlois and Stewart as our guide in the case sub judice, we find that LSA-R.S. 14:91.1 and 14:91.2 create a similar special duty. These statutes, inter alia, make it unlawful for persons under the age of 18 to possess any alcoholic beverage. Looking at the history of these statutes, it is clear that their passage was prompted by the enactment of 23 U.S.C. § 158 which directed the Secretary of Transportation to withhold a percentage of federal highway funds otherwise allocable from States "in which the purchase or public possession ... of any alcoholic beverage by a person who is less than twenty-one years of age is lawful." South Dakota v. Dole, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987).
In the South Dakota decision, the United States Supreme Court examined the purpose of Section 158 and stated at 483 U.S. at 208, 107 S.Ct. at 2796-97, "Congress found that the differing drinking ages in the States created *568 particular incentives for young persons to combine their desire to drink with their ability to drive, and that this interstate problem required a national solution." Thus, it is clear that LSA-R.S. 14:91.1 and 14:91.2 were designed to protect individuals 17 years of age and younger from the risks associated with possessing alcoholic beverages and driving. In accord, Garcia on behalf of Garcia v. Jennings, 427 So.2d 1329 (La.App. 2 Cir. 1983); Chausse v. Southland Corp., 400 So.2d 1199 (La.App. 1 Cir.1981), writs denied, 404 So.2d 497, 498 (La.1981). Furthermore, the enacting legislation associated with these statutes requires the state police to "submit a [yearly] report ... compiling the number of alcohol related vehicular accidents on state highways by age groups." (Emphasis added.) Acts 1986, 1st Ex.Sess., No. 33, Section 4. Therefore we hold that LSA-R.S. 14:91.1 and 14:91.2 clearly create a legislatively mandated "special duty" which police officers are to enforce within the meaning of Stewart.
As further support for the rationale of Stewart, we note the similar results reached recently in Blair v. Tynes, supra. In Blair, the plaintiff's wife was attending a function at an American Legion hall near Bogalousa. As she walked across the street after the function ended, she was struck and killed by an automobile. Although the American Legion had hired sheriff's deputies to control the traffic, the Washington Parish Sheriff's Office contended it had no duty to protect the pedestrians. The Louisiana Supreme Court rejected the Sheriff's Office's denial of a duty, and held that LSA-R.S. 32:5, which authorizes law enforcement officers to enforce state traffic laws, created a duty toward these pedestrians.
In the case sub judice, we do not find it a distinguishing factor that Victor and Fry were off-duty from the Calcasieu Parish Sheriff's Office when they worked at the Downtowner as security guards. For purposes of whether the security guards owed a special duty under the facts presented, we find Blair dispositive since that case also involved an entity which hired deputies to perform a function for it, independent of their status as deputies. However, what we find most critical in the present case is the acknowledgment the security guards made that they were keenly aware of the criminal statutes on which we base their special duty and their obligation to enforce these laws as security guards. Therefore, after carefully analyzing the facts of the case before us, we find that our determination of the existence of a duty by the off-duty deputies to Shannon is fully embraced by the holding in Blair.
Breach of duty. In its discussion of breach of duty in Harris, supra, the Louisiana Supreme Court recognized that this is a factual determination and stated at 1372:
"The inquiry is whether the duty was violated, but there is also a requirement that the breach must be negligent, substandard or blameworthy. The answer to this question is intertwined in the consideration of causation." (Footnotes omitted.)
After carefully examining the evidence, we find that the record fully supports a finding that it was obvious to the Downtowner's management that young people on the second floor of the motel were under age and were openly possessing and consuming alcoholic beverages.
William Woodward, president of Cyprien, Inc., the motel owner, testified that if he had known that 16 year olds were drinking, he would have ordered the policemen to carefully watch the room and would have ousted the minors. Notwithstanding this general statement, Woodward testified that he encountered Sole and his friends in the lobby of the motel when they openly transported their 16 gallon keg of beer to their room. Although he asserted that Sole looked older than 18, Sole told him that he and his 3 friends were going to drink beer and watch the LSU game on television. Timothy Vaughn, the Downtowner's night desk manager, testified that Woodward told him that Sole had brought a keg of beer into the motel. Vaughn candidly admitted that when he heard this from Woodward, it crossed his mind that with a 16 gallon keg of beer that other persons would be coming to share the alcoholic beverage. Nevertheless, the Downtowner's management took no precautionary measures to monitor the activities going on in the vicinity of Sole's room.
*569 Now, referring particularly to the use of security guards, in Harris, supra at 1372, the Louisiana Supreme Court further stated that, "Where a duty has been assumed to provide a security guard, it is necessary to decide whether that guard was acting with reasonable care in preventing the harm incurred."
In the present case, the security guards, Victor and Fry, testified that they were dressed in their Calcasieu Parish Sheriff's Office uniforms and were wearing their badges. They admitted that they were familiar with the laws prohibiting minors from possessing and consuming alcoholic beverages. Moreover, both deputies acknowledged that even when they work privately as off-duty security guards that they had an obligation to enforce Louisiana laws pertaining to the possession or consumption by minors of alcoholic beverages.
Deputy Victor testified that sometime after 9 p.m. on the night of the accident, the Downtowner management asked him to check out people who were congregating on the second floor breezeway of the motel. When he arrived, he recalled seeing 8-12 people in front of room 229, Sole's room. The door of the room was open and the deputy stated he saw a large keg of beer in plain sight. The deputy was not certain of the age of the people who had congregated, but he believed that they were between 16 and 19 years of age. He testified that he advised them that if they "kept everything down" and got "the people in the room," there would not be a problem. The record further suggests that Deputy Victor repeated this warning shortly thereafter.
The Downtowner later asked Deputy Victor around 10 p.m. to again return to the second floor balcony. He said that when he went this time the number of young people congregating on the breezeway around room 229 had dramatically increased. Deputy Victor originally estimated that there were as many as 200 persons on the balcony, but later admitted that this figure was much too high. Deputy Fry, who later accompanied Deputy Victor, estimated that there were closer to 100 persons on the balcony.
The deputies, together with Wayne Sensat, the Downtowner's lounge manager, went to the second floor balcony. When the deputies arrived upstairs, they informed the crowd of youths that whoever was not registered as a guest of the Downtowner had to leave the premises. As pointed out in the facts, although the registered guests in Sole's room (229) were informed as such, there is no testimony which shows that Cavenah's room (225), the room rented for Shannon and her friends, was informed that they could remain if they were registered guests. The record only shows that the persons in room 225 heard that the Downtowner wanted the youths to leave. At first the crowd dispersed and then gathered again on the balcony. When the deputies saw the crowd reassemble, they again dispersed them and followed them into the parking lot to make certain that they left.
When the evidence of the deputies' actions in dispersing the crowd are examined, two critical facts surface. First, the record establishes that the deputies recognized that a substantial number of the young people involved in this party were minors. Deputy Victor estimated that the young people he saw ranged in age between 16 and 19. Deputy Fry testified that he was certain some of the young people were under 18 years of age. As shown from the record, almost all of the young persons who testified were under 18 years of age at the time they were at the Downtowner, and their testimony indicates that the majority of the young persons at the Downtowner with them were under 18 years of age. More particularly, Sole stated that he candidly advised Deputy Fry that he was 16 years of age and that the keg of beer in the room belonged to him.
Second, the record shows that the young people openly possessed and consumed alcoholic beverages. Chris Durio, who had just made 18, testified that he was probably holding a mixed drink when the security guards arrived and that it was obvious teenagers were drinking. Adrienne Davenport, a 16 year old, Shannon's friend who accompanied her for the evening, corroborated Durio's statement and further said that beer containers were visible on the counters *570 of their room. Chris Carpenter, another 16 year old, also said that teenagers had alcoholic beverages in their hands in plain view. Moreover, both deputies testified that they viewed the keg in room 229 and saw numerous young persons with paper cups that they associated with the beer keg. There also was testimony that some of the youths were holding small green bottles, presumably wine coolers.
Despite these facts, the deputies asked none of the young people for identification and summarily asked all of the youths to leave the premises. The effect of their ejection from the premises of the Downtowner was highlighted in the testimony of Adrienne Davenport, Shannon's companion for the evening. She said that when they were told to leave, she and Shannon discovered that Stephanie Monticello, a 16 year old, the person with whom they rode to the Downtowner, had left, and suddenly, they had to figure out how they were going to leave. Carrico's testimony was that all of the teenagers left in a rush and that they were at a loss for plans on how everyone would leave. Shortly after making hastily concocted travel plans and leaving the Downtowner, Shannon Kramer was injured when Carrico's automobile crashed into a tree.
When we examine the major points raised in defense of the Downtowner's and their security guards' actions, the evidence does not preponderate in their favor. It is a "red herring" to ask us to take note that the security guards never went to Shannon's room. Although the security guards' directives began with Sole's room, their orders were not limited to those confines; to the contrary, the message that followed went out to Carrico and Shannon, together with all the other youths, with the exception of Sole and his three friends, that they were to leave. Likewise, to say that neither security guard observed any one intoxicated begs the question. Their duty, when they had knowledge that teenagers under the age of 18 were possessing and consuming alcoholic beverages, called for them to enforce the laws regarding minors and to halt the proceedings.
Lastly, we find no merit to the defendants' contention that they had no other option other than to evict the minors from the premises of the Downtowner. Earlier, we alluded to the jurisprudential recognition that minors cannot safely handle alcohol. Garcia, supra; Chausse, supra. Accordingly, in the enforcement of the laws against minors drinking alcoholic beverages, the Downtowner should have been cognizant of that fact and chosen a course of action which did not exacerbate the already present problems associated with that drinking. Their actions of throwing out intoxicated under age teenagers onto the motoring public was the worse possible option the Downtowner did exercise, after allowing them to get intoxicated there. We find this conduct unreasonable.
Therefore, when we apply the facts of this case to the duty which the Downtowner owed, we find two clear breaches of duty: (1) once the security guards were aware that under age persons were possessing and consuming alcoholic beverages on their premises, they failed to confiscate the alcoholic beverages or to order that the young people cease the possession and consumption of alcoholic beverages; (2) with the knowledge that the young persons associated with the party were in possession of and were consuming alcoholic beverages, they ordered them to leave the premises and thereby exposed Shannon to injury because of the drinking which had taken place on the premises of the Downtowner.
In summation, we find that the jury was manifestly erroneous in its determination that the Downtowner was not negligent. It hired security guards, off-duty police officers, who were well aware of the laws of Louisiana and who, despite knowledge of the minors' drinking of alcoholic beverages, negligently chose to have them drive from the premises. As employer of these security guards, the Downtowner is liable for the damages Shannon and her parents suffered as a result of that negligence. LSA-C.C. Art. 2320. As elaborated upon earlier, the Downtowner clearly breached each of the duties found herein, and ultimately Shannon suffered injuries which were, at least in part, the *571 direct result of its dereliction of the duties detailed hereinabove.
In making this determination, we, in part, distinguish Lowe v. Patterson, 492 So.2d 110 (La.App. 1 Cir.1986), writ denied, 496 So.2d 355 (La.1986), the case defendants cite for the proposition that they owed no special duty to Shannon, and use it to partially illustrate our finding that in the case sub judice the deputies breached the special duty they owed to Shannon.
In Lowe, the plaintiff, a minor, became intoxicated at a dance held in the high school gymnasium and a vehicle ran over him after he passed out in the parking lot. The plaintiff sued the school and the two deputies assigned as security for the dance. After reviewing the facts, our fellow judges of the First Circuit found that the deputies did not owe a special duty to the injured plaintiff.
When we review the Lowe case, that decision can be distinguished since LSA-R.S. 14:91.1 and 14:91.2 were not in effect at the time of the decision and thus there was no statutorily recognized special duty owed by the deputies. On the other hand, the facts in Lowe can be used to illustrate action on the part of the deputies which is glaringly absent in the case sub judice. The First Circuit cited the following fact at 113:
"[T]hey [the deputies] had been patrolling the parking lot and that, at an earlier point in time, had forced a student to pour out a can of beer in the parking lot."
This positive act on the part of the deputies is precisely the course of action which Deputies Victor and Fry failed to do in the present case. By making a decision not to confiscate the alcoholic beverages possessed by the young persons associated with the second floor party after becoming aware that persons under the age of 18 were involved, the deputies breached the special duty owed to Shannon which is legislatively established under LSA-R.S. 14:91.1 and 14:91.2, and their actions which followed exacerbated their initial breach and culminated with the damages Shannon ultimately suffered.
At this point, we find it appropriate to state that we do not impose any form of strict liability upon innkeepers; nor do we impose a duty upon them to investigate or search a patron's room. However, we cannot condone a motel proprietor who blatantly ignores the law and allows youths who are obviously under age and obviously drinking alcoholic beverages to use its premises for those very purposes. This conduct is reprehensible and challenges the law and the courts to check blameworthy conduct of responsible adults. The Downtowner cannot escape legal responsibility for the glaring breaches which are detailed in the record. We hasten to add that this is especially true in this case where local under age teenagers have routinely rented motel rooms there for parties because the teenagers were too young to patronize barrooms. Under the facts of this case, the Downtowner should have reasonably foreseen that injuries would be caused by an alcohol related accident by a minor, who was allowed to drink and become intoxicated on its premises with its knowledge, and who was forced to drive in that condition by the Downtowner.

APPORTIONMENT OF FAULT
Having determined that the jury was manifestly erroneous in its determination of the liability of the deputies/security guards and the Downtowner as contended by the Kramers, we are now asked to examine the apportionment of fault.
The jury apportioned fault 80% to John Carrico, 15% to Shannon, and 5% to Mrs. T.G. Kramer. From the outset, we find no error in the jury determination that Shannon was 15% at fault for her misjudgment in abandoning reliable transportation with friends with whom she arrived at the party in favor of accepting a ride with John Carrico whom she knew was drinking.
However, as urged by the Kramers, we find that the jury's assessment of 5% fault to Mrs. T.G. Kramer clearly not supported by the record. We find that although Mrs. Kramer had a duty to monitor her daughter's activities in order to protect her from unsafe practices, we do not find that she breached this duty. The record shows that she did monitor her daughter's activities. Mrs. Kramer testified that she does not drink, and that she and her husband *572 warned Shannon of the dangers of drinking and driving. On New Year's Eve, she stayed home to wait for her daughter, and both she and her husband were awake waiting for Shannon's return. Mrs. Kramer's awareness of some discussion about her daughter going to the motel party prompted her to question Shannon and Adrienne Davenport, Shannon's friend who picked her up, about their plans before returning to the Kramers for the night. Adrienne and Shannon told an untruth to Mrs. Kramer, promising her that they would not drink, and that they were attending a party at a boy's home. Mrs. Kramer did not call the boy's house to confirm the girls' story, but did speak to Adrienne's mother, confirming that Adrienne would spend the night at the Kramer residence. In light of these facts, we cannot say that Mrs. Kramer was lax in her duty to protect her daughter and find that the jury's assessment of 5% fault to her was manifestly erroneous. Instead, we find that the record shows that she is without fault.
Having found no error in the jury's assessment of 15% fault to Shannon and having found that the jury was manifestly erroneous in casting Mrs. T.G. Kramer with 5% fault, we are now called to examine how the remaining 85% fault should be apportioned between John Carrico, and the Downtowner.
In Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 974 (La.1985), the Louisiana Supreme Court stated:
"In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties."
Based on the guidelines enunciated in Watson, we find that on the basis of relative fault of each party as delineated herein above, we apportion fault as follows: 50% to John Carrico; 35% to the Downtowner; and 15% to Shannon Kramer.

DAMAGES
The defendants answered the appeal, contending that the increase in damages given by the trial judge on the Kramers' motion for JNOV was improper, because it was rendered in favor of defendants, the Carricos and their insurer, State Farm, who were dismissed from the law suit after the jury verdict. In the event we vacate the JNOV, the defendants further contend that the jury's damage award was excessively high.
A judgment is a solemn adjudication of a court, which settles the rights of the parties, as disclosed by the record, and which passes on the matters presented for determination. Cheramie v. Vegas, 468 So.2d 810 (La.App. 1 Cir.1985), writ denied, 470 So.2d 122 (La.1985).
In the present case, the defendants assert that at the time the trial judge granted the Kramers' motion for JNOV, the Carricos and their insurer had already been dismissed from the law suit. Thus, they contend that the trial judge was powerless to grant a JNOV since there were no defendants left in the law suit against whom the JNOV could be entered.
We have reviewed the record and find no judgment of the trial court which dismissed the Carricos and State Farm from the law suit. Instead, we find only a minute entry to that effect. As recognized early on in Fisher v. Rollins, 231 La. 252, 91 So.2d 28 (1956), a minute entry does not constitute a final judgment. See also, State v. Smith, 571 So.2d 746 (La.App. 2 Cir.1990); Mestayer v. Mestayer, 302 So.2d 342 (La.App. 3 Cir. 1974). Accordingly, we find that in the absence of a signed judgment dismissing the Carricos and State Farm, we cannot say that we have a solemn adjudication of a court, disclosed by the record, which dismisses them from these proceedings. Therefore we *573 are powerless to entertain the argument the Downtowner, its security guards, and their insurers, advance based on such a dismissal.
Now, viewing the trial judge's grant of the motion for JNOV on the issue of damages, we first refer to LSA-C.C.P. Art. 1811(F) which provides: "The motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues." A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable jurors could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986).
Focusing specifically on the issue of damages in a JNOV motion, Anderson v. New Orleans Public Service, 583 So.2d 829, 833-834 (La.1991), states:
"Once a trial court has concluded that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abusively low, it must then determine what is the proper amount of damages to be awarded. In making this determination, the judge is not constrained as the courts of appeal are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded that court.
* * * * * *
The trial judge is in a better position to make a damage assessment than is an appellate court. The trial judge hears the testimony, views the evidence, and is able to evaluate the credibility of the witnesses. Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact. It should not be limited by the same constraints placed upon an appellate court reviewing a damage award. The trial court should make an independent assessment of the damages and award a proper amount of compensation under the facts of the particular case."
In the case sub judice, the trial judge raised the following jury awards: (1) impairment of earning capacity, from $250,000 to $563,570; (2) future medical expenses, from $200,000 to $750,000; and, (3) general damages, from $150,000 to $1,000,000.
Impairment of earning capacity. The only expert in economics who testified on this item of damages was Donald W. Cornwell. His estimate of Shannon's loss ranged between $563,570 and $464,855. The trial court accepted Cornwell's higher estimation.
In brief, the defendants contend that in their cross-examination, they showed that Shannon had been employed at a Kroger store and that she was going to pursue a college degree at Northeast State University. Contrastingly, the trial judge pointed out that the evidence showed that Shannon's employment at Kroger's was because of a familial friendship and that ultimately, she was unable to do her job. Likewise, with regard to Shannon's attendance at college, Dr. Lawrence Dilks, Shannon's treating psychologist, estimated her chance of successful completion of a college curriculum at zero percent. The record further shows that testing established that Shannon suffered a 20 point reduction in her IQ and that she had significant memory problems. Although there may have been some evidence of Shannon's future employability, the record is woefully short of evidence that preponderates in favor of the defendants' assertions herein.
Therefore, after reviewing the record, we find no error in the trial judge's determination of this issue on the motion for JNOV, since reasonable jurors could not differ as to the fact that the jury award for earning capacity was abusively low.
Future medical expenses. Three experts testified at trial on this aspect of the Kramers' damage claim: Dr. Lawrence Dilks, Shannon's treating psychologist; Glenn Hebert, an expert in catastrophic care; and Cornwell, the economist. As noted by the trial court, Shannon's need for future medical expenses, in particular, orthopedic care and future attendant care, was practically *574 uncontradicted. These experts placed a value on this damage item which ranged from approximately $1,115,000 to $1,394,000.
Although the defendants did not introduce contradictory expert testimony on Shannon's need for future medical expenses, the jury awarded her only $200,000. After reviewing the record, we find no error in the trial judge's determination of this issue, since reasonable jurors could not differ as to the fact that the jury award for future medical expenses was abusively low. Furthermore, in light of the testimony on this issue, we find that the trial judge's independent assessment of damages in this regard and his award of $750,000 is well supported by the record.
General damages. The jury award for general damages in the case sub judice was $150,000. On the motion for JNOV, the trial judge raised the award to $1,000,000. Commenting on his decision to grant the JNOV on this item of damages, the trial judge referred to his trial notes and remarked as follows:
"Before this accident, Shannon was a very bright, attractive, popular, involved high school student. She was a cheerleader. She had many friends. She was easygoing, fun-loving. It's trite, perhaps, to say, but the world was pretty much at her feet so far as Shannon was concerned, and then thereafter, because of the accident, she had a coma lasting some ... seven weeks. She was required to spend months, and months of rehabilitation. She had to learn to walk. She had to learn how to talk all over again. And let's not forget not only does she have a severe brain injury, she had a very serious back injury; and, of course, she had this urinary problem because of the long confinement. But the point I want to make is her personality physically, flesh-wise, except for a gain in weight that probably she would not have had, she looks sufficiently adequate. That's outwardly. But inwardly she has a personality that now is completely unstable, easily angered, frequent temper outbursts. Her own mother says that she's angry 80 percent of the waking hours, easily confused. Suffered the cognitive losses described earlierNo, no question at all but that her injuries have affected her lifestyle drastically as well as the fact that she had extreme suffering, physical and mental, and has sufficient grasp of her situation to continue, and that's the part that really, really hurts. She continues to experience that because she has a sufficient grasp to understand what could have been, but there is nothing that she can do about it, nothing. There's no rehabilitation out there anywhere in sight that can help this girl. To the contrary, in all probability, the more frustration she encounters, the worse it's going to get.
Consequently, I considered this injury, or these injuries, not only for the effect that it has on her ability to seek a career, but also on her private and recreational aspects. She cannot attempt to marry or have children according to the expert. Now, that's tough ... The need to continue your bloodline is just the greatest need that the good Lord puts in us.
And this expert, whom I accepted, and who I believe says she cannot marry and have childrennot because she physically can't but because of the effect it could have on the husband and the children.... I particularly looked at the Trahan [v. State, Department of Transportation & Development] case, 536 So.2d 1269, it being one of the latest expressions by our Third Circuit on injuries of this sort. That case also involved a young person who had brain damage, and the Court of Appeal in that case concluded the lowest, least permissible in general damages was $700,000." (Record, volume 14, p. 3512)
After reviewing the record, we find no error in the trial judge's determination of this issue, since reasonable jurors could not differ as to the fact that the jury award of $200,000 for general damages was abusively low. Furthermore, in light of the testimony on this issue, we find that the trial judge's independent assessment of damages in this regard and his award is well supported by the record.
Therefore, in conclusion, we find no error in the trial judge's grant of the Kramers' motion for JNOV on the issue of damages.

*575 JUDGMENT
For the foregoing reasons, we will recast those portions of the trial court's judgment which we reverse and in all other respects, the judgment of the trial court is affirmed.
It is hereby ORDERED, ADJUDGED AND DECREED that the trial court's judgment finding MRS. T.G. KRAMER 5% at fault is reversed and set aside.
It is FURTHER ORDERED, ADJUDGED, AND DECREED that judgment is hereby rendered in favor of MR. and MRS. T.G. KRAMER in the sum of TWENTY-FIVE THOUSAND AND NO/100 ($25,000.00) DOLLARS each, against WALTER L. CARRICO and JOHN D. CARRICO ($50,000.00 multiplied by John D. Carrico's 50% fault), plus legal interest from date of judicial demand.
It is FURTHER ORDERED, ADJUDGED, AND DECREED that judgment is hereby rendered in favor of MR. and MRS. T.G. KRAMER in the sum of SEVENTEEN THOUSAND, FIVE HUNDRED AND NO/ 100 ($17,500.00) DOLLARS each, against CYPRIEN, INC. d/b/a DOWNTOWNER MOTEL and TRANSPORTATION INSURANCE COMPANY ($50,000.00 multiplied by Downtowner Motel's 35% fault), plus legal interest from date of judicial demand.
It is FURTHER ORDERED, ADJUDGED, AND DECREED that judgment is hereby rendered in favor of SHANNON KRAMER in the sum of ONE MILLION, ONE HUNDRED FIFTY-SIX THOUSAND, SEVEN HUNDRED EIGHTY-FIVE AND NO/100 ($1,156,785.00) DOLLARS, against WALTER L. CARRICO and JOHN D. CARRICO ($2,313,570.00 multiplied by John D. Carrico's 50% fault), plus legal interest from date of judicial demand.
It is FURTHER ORDERED, ADJUDGED, AND DECREED that judgment is hereby rendered in favor of SHANNON KRAMER in the sum of EIGHT HUNDRED NINE THOUSAND, SEVEN HUNDRED FORTY-NINE AND NO/100 ($809,749.00) DOLLARS, against CYPRIEN, INC. d/b/a DOWNTOWNER MOTEL and TRANSPORTATION INSURANCE COMPANY ($2,313,570.00 multiplied by Downtowner Motel's 35% fault), plus legal interest from date of judicial demand.
Costs of trial and this appeal are assessed to all parties in proportion to their fault.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
COOKS, J., concurs in the result.
DOUCET, J., dissents and assigns reasons.
DECUIR, J., dissents for the reason assigned by Doucet, J.
DOUCET, Judge, dissenting.
I respectfully dissent from the majority opinion herein. Under the facts as established at trial, no basis exists of law for the imposition of liability against the Downtowner Motel when the jury verdict is appropriately reviewed under a manifest error standard.
The evidence concerning the events leading up to this tragic accident was conflicting. On the evening of the accident, two rooms at the Downtowner were rented to two high school boys, despite the Downtowner's policy against renting rooms to minors. There was evidence that one of the boys, 16 year old Cary Sole, presented false identification indicating that he was 23. While the majority would like the defendant Motel to have made and introduced a photocopy of the false identification, the absence of such evidence does not relieve us of the requirement of applying a manifest error standard of review to the credibility evaluation made by the jury. The other young man, Greg Cavenah, was nearly 18 years old and was 6'1" tall and weighed 210 pounds.
A number of high school students began to congregate in the rooms at some point after they were rented. Shannon Kramer and several of her fellow Barbe High School cheerleaders were among them. In fact, the cheerleaders had pooled their money and enlisted Greg Cavenah to secure one of the rooms for them for the purpose of hosting a party. Because her parents would not have consented to her attending such a party, Shannon lied to her mother about her plans *576 for the evening. Unfortunately, Mrs. Kramer did not attempt to verify the false information that she gave, despite the fact that Shannon had been caught drinking alcoholic beverages in the past.
The exact number of students who attended the party was disputed. However, it is clear that they were sufficient in number to create a disturbance, and complaints were made by the occupants of nearby rooms. It is also clear that the students brought in and consumed a variety of alcoholic beverages, including at least one keg of beer. As I read the evidence of record, it does not support the conclusion that the keg was "paraded" past the front desk.
After receiving several complaints, the management of the Downtowner instructed the deputies, who were moonlighting as security guards, to evict the party goers who were not registered guests of the hotel.
The deputies carried out those instructions, and Shannon left the party with John Carrico and four other students. It was undisputed that prior to instructing the students to leave, the deputies became aware of the fact that at least some of them were minors and that some had been drinking alcoholic beverages. However, there was no evidence clearly establishing that they were made aware of John Carrico's age or of the fact that he had been drinking. On the contrary, the testimony was uniformly to the effect that when John left the party, he showed no signs of inebriation.
Notwithstanding his sober appearance, John had in fact been drinking, and his blood alcohol content was measured after the accident at 0.15 percent. Whether or not his alcohol consumption contributed to the accident was not clearly established. The plaintiffs presented no expert testimony concerning the effect that his blood alcohol might have had on John's driving. The majority makes the assumption that because of his youth, John's driving must necessarily have been affected by drinking. However, this assumption is not supported by the record or by the jurisprudence. The testimony of record in fact supports the conclusion that he was not impaired. The circumstances of the accident were such that it could easily have occurred even if he had not been drinking. On the night of the accident, it had been raining, and the streets were wet. John left the Downtowner parking lot without incident and drove along Lakeshore Drive and Shell Beach Drive. He missed his intended turn on Lake Street and took an alternative route, turning left at the next available street, and left again onto Sallier Street. While on Sallier Street, he passed another car. After returning to his lane, he encountered an Scurve where Sallier Street crosses a set of railroad tracks and then runs parallel to the tracks on the opposite side. At that point, he lost control of his vehicle and skidded on the wet pavement into a tree.
The majority's reliance on the decision in Stewart v. Schmieder, 386 So.2d 1351 (La. 1980), to create a "special duty" to detain minors suspected of drinking is misplaced. The duty that the court found in Stewart was derived from a section of the Baton Rouge Building Code, which required the building official to require detailed plans and specifications to be submitted by a licensed architect or engineer before issuing a building permit. The court held that although this duty would be generally considered to be owed to the public, it could be applied to a claim brought by an individual.
In this case, the statutes from which the majority derives the "special duty" do not affirmatively impose any duty on the Downtowner or the off-duty deputies. LSA-R.S. 14:91.1 and 14:91.2 make it illegal for persons seventeen years of age and under to purchase or possess alcoholic beverages. They impose no affirmative duties on motels or their security guards.
I find it significant that our brethren of the First Circuit did not impose this "special duty" in deciding Lowe v. Patterson, 492 So.2d 110 (La.App. 1 Cir.), writ denied, 496 So.2d 355 (La.1986), six years after the decision was rendered in Stewart v. Schmieder, supra. The majority's attempts to distinguish the Lowe case on the ground that the minimum drinking age was subsequently raised are unpersuasive. In the Lowe case, the plaintiff's son was injured on September 7, 1979. The opinion states that he did not *577 reach the age of majority until after the suit was filed, making him younger than eighteen at the time that his cause of action arose. LSA-R.S. 14:91.1 and 14:91.2, as they existed in 1979, made it unlawful for any person under the age of eighteen to purchase alcoholic beverages. Consequently, any duties that these statutes give rise to existed when the Lowe case was decided.
Even if it were possible to conclude that either the deputies or the Downtowner had breached a duty owed to Shannon, I would be unable to find, on the basis of the record, that it was a proximate cause of Shannon's injuries. The majority's decision is premised on the conclusion that John Carrico was intoxicated and that his intoxication caused the accident. However, the legal presumption of intoxication based on a blood alcohol of 0.1 percent or more does not apply in civil proceedings. LSA-R.S. 32:662; Parker v. Krogers, Inc., 394 So.2d 1178 (La.1981).
This court has repeatedly held that although civil litigants can introduce evidence of a person's blood alcohol level, as was done in this case, competent expert testimony is needed to establish whether the blood alcohol level would result in intoxication and the effects that it would have on the person's ability to operate a motor vehicle. Richard v. Missouri Pacific Railroad Co., 536 So.2d 755 (La.App. 3 Cir.1988); Remedies v. Trans World Life Insurance Co., 546 So.2d 1380 (La.App. 3 Cir.1989); Brown v. Collins, 223 So.2d 453 (La.App. 3 Cir.1969). There must further be a showing of a causal connection between the alcohol consumption and the accident. Theriot v. Lasseigne, 624 So.2d 1267 (La.App. 3 Cir.1993); Henry v. Belgard, 368 So.2d 472, 474 (La.App. 3 Cir.), writ denied, 371 So.2d 619 (La.1979); Carter v. Alexis, 356 So.2d 445 (La.App. 1 Cir.1977); Sedotal v. Gaspard, 207 So.2d 849 (La.App. 1 Cir.1968). No expert testimony was presented in this case with regard to John Carrico's blood alcohol level and its effect on his ability to drive. The lay testimony in fact establishes that Carrico was not showing any signs of intoxication. Consequently, it is not possible to conclude on the basis of the record that he was intoxicated or that his intoxication was a cause of the accident.
We cannot supply presumptions as to the effect of alcohol on young persons without a legal or evidentiary basis for so doing. The creation of legal presumptions is the province of the legislature and not the courts.
In light of the foregoing, the appellants have failed to demonstrate manifest error in the jury's finding that the deputies and the Downtowner were not at fault. They have not established that the injuries to Shannon were caused by the breach of a duty owed her by the Downtowner Motel.
Additionally, the jury's assignment of five percent of the fault to Mrs. Kramer should not be disturbed. While the evidence clearly shows that Mrs. Kramer loves her daughter and had the best of intentions, the fact remains that she could have prevented Shannon from going to the party by verifying her whereabouts for the evening. She overheard some of the girls' conversations about renting rooms for a party, and she was aware of Shannon's prior alcohol consumption. As a parent, she had a duty to monitor her daughter's activities in order to protect her from unsafe practices. The jury obviously found that she had breached that duty. While I might not have reached the same conclusion, I cannot say that the jury was clearly wrong.
Accordingly, I would affirm the judgment of the trial court.

ON REHEARING
PER CURIAM.
Mr. and Mrs. T.G. Kramer, Shannon Kramer, and Ry-Ron, Inc., the Kramers' medical insurer who intervened in this law suit, have filed applications for rehearings with this court to clarify our decree.
PAST MEDICAL EXPENSES. The Kramers and Ry-Ron first point out that we inadvertently neglected to include an award for Shannon Kramer's past medical expenses and omitted Ry-Ron's reimbursement rights to this sum.
At trial the parties stipulated that Ry-Ron paid $197,254.91 for medical expenses which Shannon incurred and that Ry-Ron was entitled to reimbursement in that amount. In accordance with that stipulation, the jury *578 awarded $197,254.91 for Shannon's past medical expenses. In its JNOV the trial court confirmed this award.
Accordingly, we grant the applications for rehearing in part to recognize that Shannon Kramer's past medical expenses amounted to $197,254.91 and that Ry-Ron was entitled to reimbursement in this amount.
SOLIDARY LIABILITY. The Kramers and Ry Ron also ask us to clarify our opinion by specifically stating that the following defendants are solidarily liable: Cyprien, Inc., d/b/a Downtowner Motel, and its insurer, Transportation Insurance Company; Eugene Victor and Russel Fry, the off-duty deputies employed by the Downtowner, and their insurers, Anglo American Insurance Company, Walbrook Insurance Company, LUI Syndicate, Inc, and Calfed Syndicate, Inc.; and, Walter and John Carrico.
From the outset, we note, as stated in our original opinion, that although the original and third-party claims against Sheriff Wayne McElveen were dismissed, Russell Fry, Eugene Victor, and their insurers, Anglo-American Insurance Company, Walbrook Insurance Company, LUI Syndicate, Inc., and Calfed Syndicate, Inc., remained defendants in the law suit. In the trial on the merits these various insurers stipulated that they provided coverage to Fry and Victor even if they were not in the course and scope of their employment with the Calcasieu Parish Sheriff's Department.
LSA-C.C. Art. 1795 provides that an obligee, at his option, may demand the whole performance from any of his solidary obligors. To an extent, LSA-C.C. Art. 2324 modifies Article 1795 and provides that when liability is caused by two or more persons, their obligation is considered solidary to the extent necessary for the injured person to recover 50% of his recoverable damages.
In the case sub judice, we found that the defendants, Carrico, the Downtowner, and its employees, were at fault and contributed to Shannon Kramer's injuries. The Downtowner and its employees allowed a group of intoxicated youth to consume intoxicating liquor on its premises and caused them to exit the motel after drinking. John Carrico, one of these youths at the motel, drove his vehicle in an intoxicated condition and became involved in an accident. When the acts of these defendants are viewed, it is clear that their acts combined to cause Shannon's injuries. Accordingly, the Downtowner, its employees, and Carrico are solidarily liable for Shannon's injuries as provided in LSA-C.C. Art. 1795 and 2324.
Therefore we will grant the rehearing to state that the various defendants and their insurers are solidarily liable for the Kramers' damages.
RECOVERABLE DAMAGES. Ry-Ron and the Kramers next ask us to grant a rehearing to consider that the defendants should be held solidarily liable for 50% of the Kramers' and Ry-Ron's damages, regardless of the 15% fault assessed to Shannon Kramer. Ry-Ron and the Kramers cite no jurisprudential authority for their assertion.
Contrary to the assertions of Ry-Ron and the Kramers, we find that the term "recoverable damages" found in LSA-C.C. Art. 2324 is modified by LSA-C.C. Art. 2323. Under Article 2323, the amount of damages recoverable is reduced by the proportion or degree of fault attributable to the plaintiff. We note that Article 2323 was amended to adopt the "pure form" of comparative negligence and Article 2324 was amended accordingly to effectuate the scheme established in Article 2323. See, Malone & Johnson, Tort Doctrine, Sec. 55.5. To this effect, Article 2324 should be read in conjunction with Article 2323 thereby reducing the plaintiffs' recovery from a solidary tortfeasor by plaintiff's own degree of fault. Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991). Accordingly, we also find that the term "recoverable damages" as used in Article 2324 must be read so that the amount of damages recoverable is reduced by the proportion or degree of comparative fault attributable to the injured plaintiff.
Therefore, we deny the application of Ry-Ron and the Kramers for a rehearing concerning this issue.
*579 Considering the applications for rehearing, we amend the decretal portion of our original opinion and recast it as follows:

DECREE
It is hereby ORDERED, ADJUDGED, AND DECREED that the trial court's judgment finding MRS. T.G. KRAMER 5% at fault is reversed and set aside.
It is further ORDERED, ADJUDGED, AND DECREED that judgment is hereby rendered in favor of Mr. and Mrs. T.G. Kramer, Shannon Kramer, and Ry-Ron, Inc., and against defendants, Walter L. Carrico and John D. Carrico, Cyprien, Inc., d/b/a Downtowner Motel and Transportation Insurance Co., Anglo American Insurance Co., Walbrook Insurance Co., LUI Syndicate, Inc., and Calfed Syndicate, Inc., solidarily and in solido, with Walter L. Carrico and John D. Carrico being found 50% at fault in causing the plaintiffs' damages, with the Downtowner, its employees and their insurers being found 35% at fault in causing plaintiffs' damages, and with the plaintiff, Shannon Kramer, being found comparatively 15% at fault in contributing to the plaintiffs' damages.
It is further ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of SHANNON KRAMER in the sum of ONE MILLION NINE HUNDRED SIXTY-SIX THOUSAND FIVE HUNDRED THIRTY-FOUR AND 50/100 ($1,966,534.50) DOLLARS (the amount of total damages $2,313,570, exclusive of past medical expenses, less 15% for comparative fault) against JOHN CARRICO, WALTER CARRICO, CYPRIEN INC., D/B/A DOWNTOWNER MOTEL, TRANSPORTATION INSURANCE COMPANY (subject to its policy limits of $1,000,000), ANGLO AMERICAN INSURANCE COMPANY, WALBROOK INSURANCE COMPANY, LUI SYNDICATE, INC. and CALFED SYNDICATE, INC. (subject to policy limits of $2,000,000), in solido, with no defendant responsible for greater than 50% of $1,966,534.50, plus legal interest from date of judicial demand, February 22, 1988, until paid.
It is further ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of RY-RON, INC. in the sum of ONE HUNDRED, SIXTY-SEVEN THOUSAND, SIX HUNDRED SIXTY-SIX AND 67/100 ($167,666.67) DOLLARS against JOHN CARRICO, WALTER CARRICO, CYPRIEN INC., D/B/A DOWNTOWNER MOTEL, TRANSPORTATION INSURANCE COMPANY (subject to its policy limits of $1,000,000), ANGLO AMERICAN INSURANCE COMPANY, WALBROOK INSURANCE COMPANY, LUI SYNDICATE, INC. and CALFED SYNDICATE, INC. (subject to policy limits of $2,000,000), in solido, with no defendant responsible for greater than 50% of $167,666.67 plus legal interest from date of judicial demand, February 22, 1988, until paid.
It is further ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of MR. T.G. KRAMER in the sum of FORTY TWO THOUSAND, FIVE HUNDRED AND NO/100 ($42,500) DOLLARS against JOHN CARRICO, WALTER CARRICO, CYPRIEN INC., D/B/A DOWNTOWNER MOTEL, TRANSPORTATION INSURANCE COMPANY (subject to its policy limits of $1,000,000), ANGLO AMERICAN INSURANCE COMPANY, WALBROOK INSURANCE COMPANY, LUI SYNDICATE, INC. and CALFED SYNDICATE, INC. (subject to policy limits of $2,000,000), in solido, with no defendant responsible for greater than 50% of $42,500 plus legal interest from date of judicial demand, February 22, 1988, until paid.
It is further ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of MRS. T.G. KRAMER in the sum of FORTY TWO THOUSAND, FIVE HUNDRED AND NO/100 ($42,500) DOLLARS against JOHN CARRICO, WALTER CARRICO, CYPRIEN INC., D/B/A DOWNTOWNER MOTEL, TRANSPORTATION INSURANCE COMPANY (subject to its policy limits of $1,000,000), ANGLO AMERICAN INSURANCE COMPANY, WALBROOK INSURANCE COMPANY, LUI SYNDICATE, INC. and CALFED SYNDICATE, INC. (subject to policy limits of $2,000,000), in solido, with no defendant responsible for greater than 50% of $42,500 *580 plus legal interest from date of judicial demand, February 22, 1988, until paid.
Costs of trial and this appeal are assessed to all parties in proportion to their fault.
REHEARING DENIED IN PART, AND GRANTED IN PART AND JUDGMENT RENDERED.
COOKS, J., agrees in part and dissents in part and assigns written reasons.
DOUCET, J., dissents and assigns written reasons.
DECUIR, J., dissents for the reasons assigned by DOUCET, J.
COOKS, Judge, agreeing in part and dissenting in part.
I agree with the amendments to the decretal portion of the original opinion as reflected in the sections titled PAST MEDICAL EXPENSES and SOLIDARY LIABILITY. However, I respectfully disagree with the view that "reasonable damages" as used in LSA-C.C. art. 2324 "must be read so that the amount of damages recoverable is reduced by the proportion or degree of comparative fault attributable to the injured plaintiff." Rather, I believe it more sound to read the phrase "recoverable damages" as meaning "total damages." I share the view of Professor David W. Robertson as expressed in an article titled Solidary Liability in Tort: Understanding Gauthier and Touchard, 41 LA.B.J. 334, 336 (1993):
As a matter of normal word usage, "recoverable damages" seems more readily to refer to what the plaintiff can actually recover after certain required reductions have been made in the total damages.
Interpreting "recoverable damages" to mean the total damages less a reduction for victim fault would involve highly complex operations in certain cases.... Furthermore, this interpretation cuts into victim's rights and into "the long standing principle of solidarity among joint tortfeasors" to an extent that seems sure to invoke Touchard's strict construction principle.
Going even further in the direction of a literal reading of "recoverable damages" and taking the phrase to mean total damages less reductions to reflect both victim fault and settling tort-feasor fault would curtail victim's rights rather markedly. Certainly an argument for this interpretation will collide with Touchard's principle of strict construction (footnote omitted).
Reading recoverable damages to mean "total damages" as used in LSA-C.C. art. 2324 is a permissible and reasonable construction of the article which yield the "best interpretation" of this "notoriously ambiguous phrase."
DOUCET, Judge, dissenting.
I respectfully dissent from the majority opinion on rehearing of this matter. I restate my objection to the imposition of liability against the Downtowner Motel as well as my belief that the judgment of the trial court should be affirmed.